## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

### Case No.:

ROXANE M. PEDRON, individually
and on behalf of all others similarly
situated,
               Plaintiff,

v.                                                 **JURY TRIAL DEMANDED**

JOHNSON &  JOHNSON CONSUMER, INC.

               Defendant.

_____/

---

### CLASS ACTION COMPLAINT

---

Plaintiff Roxane M. Pedron, based on personal knowledge as to herself, and upon information and belief as to all other matters, alleges as follows:

### NATURE OF CLAIMS

1.     Consumers purchase sunscreen to protect themselves from harm, particularly the harm caused by ultraviolet radiation which can lead to skin cancer.  These consumers trust that the sunscreen products marketed to the public will help keep them safe.  And they expect that manufacturers and distributors of sunscreen products take every reasonable step to make sure that nothing in their products endangers the lives of those who use them.

2.     This action concerns defective sunscreen products containing benzene—a known human carcinogen—which were manufactured, sold, and distributed by Defendant Johnson & Johnson Consumer Inc. ("J&J" or "Defendant") and its related entities, including entities that are represented to be defunct such as the Neutrogena Corporation ("Neutrogena Corp.").  Defendant J&J markets, distributes, and sells sunscreen products containing benzene while misrepresenting

as safe its Defective Sunscreens[1] and deceptively concealing the fact that the products are prone to increase the risk of skin cancer and other diseases, including leukemia, multiple myeloma, non-Hodgkin's lymphoma, and anemia—all found to be caused by or linked to benzene.

3.     Sunscreen is a critical component of skin cancer prevention.  Skin cancer is the most common form of cancer in the United States, and ultraviolet radiation from the sun is the number one cause of skin cancer.  Since medical experts recognize that exposure to the sun's rays is the most preventable risk factor for skin cancer, they recommend using sunscreen to decrease the risk of skin cancer caused by the sun.[2]  In fact, medical experts recommend that sunscreen be reapplied every two hours or after swimming or sweating.[3]

4.     Last year alone, the market for sun care products was approximately $8 billion globally, with $1.6 billion of sales in the United States alone.[4]

5.     Defendant J&J is one of the largest manufacturers and distributors of sunscreen.  Globally, J&J sold over $600 million in sunscreen products last year, nearly half of which were sold in the United States.[5]  J&J's sunscreen products include the popular and well-known Aveeno and Neutrogena sunscreen brands.

6.     All J&J sunscreen products at issue in this litigation, *i.e.*, the Defective Sunscreens, share a common, uniform defect: the presence of benzene, a known carcinogen (the "Defect").

---

[1] The Defective Sunscreens include the Neutrogena and Aveeno products listed in Paragraph 25 below, which are those identified as containing benzene in Valisure's citizen petition, attached hereto as Exhibit A.
[2] *SAY YES TO SUN PROTECTION*, AM. ACAD. OF DERMATOLOGY ASSOC., https://www.aad.org/public/diseases/skin-cancer/prevent/sun-protection (last visited Sept. 2, 2021).
[3] *Id.*
[4] Michael Erman & Julie Steenhuysen, *FDA investigating how a known carcinogen wound up in J&J sunscreen*, REUTERS (July 16, 2021, 5:41 PM), https://www.reuters.com/world/us/fda-investigating-how-known-carcinogen-wound-up-jj-sunscreen-2021-07-16/.
[5] *Id.*

7.      Because of the common, uniform Defect, Defendant's sunscreen products often fail to perform as they should.  Instead of protecting Plaintiff and other sunscreen product users from the risk of cancer, the presence of benzene within the Defective Sunscreens actually *increases* sunscreen users' chances of developing a host of diseases caused by or linked to benzene, including leukemia, multiple myeloma, non-Hodgkin's lymphoma, and anemia.

8.      According to the Food & Drug Administration ("FDA"), benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or deleterious environmental effect."[6]  Where benzene use is "unavoidable in order to produce a drug product with a significant therapeutic advance," its concentration should be limited to no more than 2 parts per million ("ppm").[7]

9.      In May 2021, the independent analytical pharmacy Valisure announced that it had detected dangerously high levels of benzene in numerous J&J sunscreen products.[8]  Alarmed by the results of these tests, on May 24, 2021, Valisure filed a citizen petition with the FDA to recall those defective sunscreen products.[9]

10.      Although Defendant knew that its Defective Sunscreens contained benzene, J&J waited until July 14, 2021, before finally recalling only five of its products: NEUTROGENA® Beach Defense® aerosol sunscreen; NEUTROGENA® Cool Dry Sport aerosol sunscreen;

---

[6] *Q3C—Tables and List, Guidance for Industry*, U.S. FOOD & DRUG ADMIN. (4th Revision, Aug. 2018), https://www.fda.gov/media/133650/download (hereinafter "FDA's Q3C Guidance for Industry").

[7] *Id.*

[8] *Valisure Detects Benzene in Sunscreen*, VALISURE NEWS (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.

[9] *Valisure Citizen Petition on Benzene in Sunscreen and After-Sun Care Products*, VALISURE (May 24, 2021), https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf.

NEUTROGENA® Invisible Daily™ defense aerosol sunscreen; NEUTROGRENA® Ultra Sheer® aerosol sunscreen; and AVEENO® Protect + Refresh aerosol sunscreen.[10]

11.     Defendant has not yet recalled other sunscreen products that contain similar dangerously high levels of benzene, placing customers and users of those products in grave danger.

12.     The Defective Sunscreens create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.  Defendant put profits ahead of safety by continuing to use benzene in their sunscreen products year after year, even though they knew or should have known that those sunscreens were defective.  Despite the evident testing results of excessive benzene levels, Defendant was slow to fully investigate the problem and slow to report the full extent of the danger to consumers and users of their Defective Sunscreens.

13.     As a result of this misconduct, Plaintiff and members of the proposed Classes were harmed and suffered actual damages.  Plaintiff and the Classes did not receive the benefit of their bargain; rather, they purchased sunscreen products that are of a lesser standard, grade, and quality than represented, and they did not receive sunscreen products that met ordinary and reasonable consumer expectations regarding safe and effective operation.  Purchasers of the Defective Sunscreens (defined below) paid more than they would have had the Defect been disclosed. Plaintiff and the Classes were deprived of having a safe, defect-free sunscreen product, and Defendant unjustly benefited from its unconscionable delay in recalling its defective products, as it avoided incurring the costs associated with recalls for years.

---

[10] *Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene*, U.S. FOOD & DRUG ADMIN. (July 14, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol (hereinafter "J&J Issues Voluntary Recall").

14.     Plaintiff and the Classes also suffered damages as a result of Defendant's concealment and suppression of the facts concerning the safety, quality, and reliability of Defendant's Defective Sunscreens.  Defendant's false representations and omissions concerning the safety and reliability of those sunscreen products and Defendant's concealment of the known safety defect plaguing those products and its brand caused Plaintiff and Class Members to purchase Defendant's sunscreen products of diminished value.

15.     Had Defendant's customers known that the sunscreen products they were using to decrease the risk of skin cancer actually contained excessive levels of a known carcinogen, Defendant's customers certainly would not have purchased those products.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Classes are citizens of states different from Defendant J&J's home state, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.

18.     This Court has personal jurisdiction over Defendant pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6) because: Defendant conducts substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiff's claims arise out of Defendant operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendant's acts and

omissions outside this state; and, at or about the time of such injuries, Defendant was engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.  This Court also has personal jurisdiction over Defendant because Defendant consented to jurisdiction by registering to do business in Florida. This Court has pendant or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs.

19.     J&J is in the business of designing, developing, manufacturing, marketing, and selling sunscreen products in the United States, including in Florida.  In 2020, J&J generated more than $2.3 billion in revenue from the sale of skincare products, including Neutrogena- and Aveeno-brand sunscreen products, in the United States alone.  Florida is a significant market for J&J due to its sunny climate, and J&J generates a substantial percentage of its revenue from the sale of its sunscreen products in Florida.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to these claims occurred in this District, J&J has caused harm to Class Members residing in this District, and J&J is a resident of this District under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction in this District.  Venue is also proper under 18 U.S.C. § 1965(a) because J&J transacts substantial business in this District and has appointed a registered agent in this District.

## PARTIES

### A.  Plaintiff

21.     Plaintiff Roxane M. Pedron is a resident of Miami-Dade County, Florida.  Plaintiff Pedron purchased at least one of the Defective Sunscreens sold by J&J, including

NEUTROGENA® Cool Dry Sport aerosol sunscreen, NEUTROGENA® Beach Defense® aerosol sunscreen, and NEUTROGRENA® Ultra Sheer® aerosol sunscreen. Plaintiff Pedron has been purchasing these sunscreen products for years, and Plaintiff Pedron purchased these sunscreen products at different locations, including Costco and Target. Plaintiff Pedron would not have purchased nor used Defendant's sunscreen products had she known there was a risk that the products may contain benzene, a known human carcinogen. Thus, Plaintiff Pedron has suffered a concrete injury as a direct and proximate result of Defendant's wrongful conduct, including in breaching its express and implied warranties, and in misrepresenting, omitting, concealing, and/or failing to timely disclose the risks associated with the use of the Defective Sunscreens.

### B. Defendant

22.     Defendant J&J is a New Jersey corporation with its headquarters and principal place of business at Grandview Road, Skillman, New Jersey 08558.

23.     J&J is the manufacturer and/or distributor of the Defective Sunscreens. Although J&J's former subsidiary, Neutrogena Corp., is now represented as "defunct," J&J is the owner of the Neutrogena and Aveeno brands. As one of the leaders of skin care, hair care, and cosmetic brands throughout the world, J&J distributed its products, including the Defective Sunscreens, throughout the United States, including Florida. J&J's Defective Sunscreens, including those purchased by Plaintiff Pedron and Class Members, are available at retail stores throughout the United States, including Florida.

24.     J&J is and has been qualified to do business in Florida since May 17, 1989 and maintains a registered agent in Florida. It most recently renewed its registration by filing an annual report on April 25, 2021, with the Florida Department of State, Division of Corporations, identifying CT Corporation System of Plantation, Florida as its registered agent.

## FACTUAL ALLEGATIONS

**A. Defendant's Manufacture, Marketing, Labeling, Distribution, and Sale of Defective Sunscreens.**

25.     Defendant manufactures, markets, labels, distributes, and sells a variety of Neutrogena and Aveeno brand sunscreen aerosol/spray products and lotions, including the following, which are collectively referred to as the "Defective Sunscreens":

| Brand Name | Sunscreen Type | Sunscreen Product Name |
|---|---|---|
| Neutrogena | Lotion | Age Shield Face Sunscreen Lotion SPF 110 |
| Neutrogena | Lotion | Age Shield Face Sunscreen Lotion SPF 70 |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray SPF 100 |
| Neutrogena | Lotion | Beach Defense Water Plus Sun Protection Sunscreen Broad Spectrum Lotion SPF 70 |
| Neutrogena | Spray | CoolDry Sport Water-Resistant Sunscreen Spray SPF 50 |
| Neutrogena | Spray | CoolDry Sport Water-Resistant Sunscreen Spray SPF 70 |
| Neutrogena | Lotion | Healthy Defense Daily Moisturizer with Sunscreen SPF 50 |
| Neutrogena | Lotion | Hydro Boost Water Gel Lotion Sunscreen SPF 50 |
| Neutrogena | Spray | Kids Water-Resistant Sunscreen Spray Oil-Free SPF 70 |
| Neutrogena | Lotion | Oil-Free Facial Moisturizer with Sunscreen SPF 15 |
| Neutrogena | Lotion | Pure & Free Baby Sunscreen Lotion SPF 50 |
| Neutrogena | Lotion | Sensitive Skin Sunscreen Lotion with SPF 60+ |
| Neutrogena | Lotion | Sheer Zinc Dry-Touch Face Sunscreen SPF 50 |
| Neutrogena | Spray | Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 30 |
| Neutrogena | Spray | Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 45 |

| Neutrogena | Lotion | Ultra Sheer Dry-Touch Sunscreen Lotion Broad Spectrum SPF 55 |
| --- | --- | --- |
| Neutrogena | Lotion | Ultra Sheer Dry-Touch Sunscreen Lotion SPF 30 |
| Neutrogena | Lotion | Ultra Sheer Dry-Touch Sunscreen Lotion SPF 45 |
| Neutrogena | Lotion | Ultra Sheer Dry-Touch Water Resistant Sunscreen SPF 70 |
| Neutrogena | Spray | Ultra Sheer Face Mist Sunscreen SPF 55 |
| Neutrogena | Lotion | Ultra Sheer Liquid Sunscreen Lotion Broad Spectrum SPF 70 |
| Neutrogena | Lotion | Ultra Sheer Sunscreen Lotion SPF 100+ |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray SPF 100+ |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray SPF 70 |
| Neutrogena | Spray | Wet Skin Swim Humidity Sweat Sunscreen Broad Spectrum SPF 30 |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ |
| Aveeno | Lotion | Baby Continuous Protection Sensitive Skin Sunscreen Lotion Broad Spectrum SPF 50 |

26.     Valisure LLC and Valisure RX LLC (collectively, "Valisure") is an independent analytical pharmacy whose "mission is to independently check the chemical composition of medications" and "deliver enhanced quality assurance."[11]  Valisure employs Harvard- and Yale-trained scientists to develop analytical technologies to screen products, including sunscreens, and

---

[11] VALISURE NEWS, *supra* note 8.

identify critical issues.[12]   Valisure has International Organization for Standardization ("ISO") 17025 accreditation and is DEA and FDA registered.[13]

27.    Valisure is one of the industry leaders in detecting pervasive drug quality problems, and its employees consider themselves as patient advocates.[14]   Valisure is the same independent pharmacy responsible for filing a citizen petition in September 2019 that it had discovered high and unacceptable levels of the chemical N-nitrosodimethylamine (NDMA) in some ranitidine products.[15]   Valisure's discovery led to the recall of various ranitidine products, including the heartburn pill that was one of the world's best-selling drugs—Zantac.[16]   Valisure carefully checks the chemical makeup of drugs before shipping the drugs to its consumers.[17]   Since 2018, Valisure has reported over 50 issues it has detected directly to drug companies but in some particularly alarming cases, "their scientists find a problem so urgent they play the role of watchdog."[18]

28.    In May 2021, Valisure announced it had tested and detected high levels of benzene in certain sunscreen products, including Defendant's Defective Sunscreens.[19]   Valisure raised the alarm since benzene has no known therapeutic benefit to justify its presence in sunscreen products and noted that the use of benzene was clearly unnecessary since other sunscreen products Valisure had tested did not contain benzene.[20]

---

[12] *Id.*

[13] *Id.*

[14] Carolyn Y. Johnson, *A Tiny Pharmacy is Identifying Big Problems with Common Drugs, Including Zantac*, WASHINGTON POST (Nov. 8, 2019), *available at* https://www.washingtonpost.com/science/a-tiny-pharmacy-is-identifying-big-problems-with-common-drugs-including-zantac/2019/11/08/6dd009ca-eb76-11e9-9c6d-436a0df4f31d_story.html.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*; *see also* VALISURE, *supra* note 9.

[20] *Id.*

29.     On May 24, 2021, Valisure filed a citizen petition with the FDA asking the agency to recall all batches of Defendant's Defective Sunscreens, which testing indicated contained 0.1 ppm or more of benzene.[21]   Valisure's basis for the petition was that the Defective Sunscreens were adulterated pursuant to Section 501 of the FDCA (21 U.S.C. § 351) and misbranded under Section 502 of the FDCA (21 U.S.C. § 352).[22]   Valisure also included other requests in its petition, including that the FDA "conduct examinations and investigation under Section 702(a) of the FDCA (21 U.S.C. § 372(a)) regarding these products, their manufacturing processes, and the manufacturer submissions made for FDA approval under 704(a) of the FDCA (21 U.S.C. § 374(a)), and effect labeling revisions as needed."[23]

30.     Valisure tested numerous lots of Defendant's Defective Sunscreens, discovering that certain of the Defective Sunscreens contained benzene values ranging from less than 0.1 parts per million ("ppm"), 0.10 ppm to 2 ppm, and more than 2 ppm.[24]   Valisure's citizen petition contained charts identifying the sunscreen products containing benzene, including the following chart addressing the product description and results of benzene analysis on various batches of sunscreen products, including the Defective Sunscreens, in which benzene was detected at 2 ppm or higher:

---

[21] VALISURE, *supra* note 9.
[22] *Id.*
[23] *Id.*
[24] *Id.*

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| Sun Burn | Gel | Cool Down Gel | N/A | 871760002005 | S0082C | – | N/A (Cosmetic Product) | 5.33 5.49* | 3% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 8140449A | – | N/A (Cosmetic Product) | 4.71 4.55* | 1% |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 4111849A | – | N/A (Cosmetic Product) | 3.58 3.93* | 4% |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | 2% |
| Fruit of the Earth | Gel | Aloe Vera Gel | N/A | 071661001200 | 6612940A | – | N/A (Cosmetic Product) | 2.78 2.94* | 6% |

[25]

31.     Levels of benzene were detected in the Defective Sunscreens in amounts as high as 6.77 ppm, more than three times the recommended FDA amount when there is a therapeutic advance or benefit, which there is not. [26]

32.     The presence of benzene in the Defective Sunscreens is highly dangerous and concerning given both benzene's notoriety as a carcinogen and that, by the nature of their use, sunscreens are recommended during any exposure to the sun to be applied to the skin of adults and children.

33.     Valisure noted "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total exposure." [27]

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

34.     J&J's July 14, 2021, voluntary recall announcement identified five Neutrogena and Aveeno aerosol sunscreen product lines, including NEUTROGENA® Beach Defense® aerosol sunscreen; NEUTROGENA® Cool Dry Sport aerosol sunscreen; NEUTROGENA® Invisible Daily ™ defense aerosol sunscreen; NEUTROGRENA® Ultra Sheer® aerosol sunscreen; and AVEENO® Protect + Refresh aerosol sunscreen. [28]

35.     But J&J's recall announcement failed to disclose the number of sunscreen products tested, the levels of benzene detected in those products, and the type of testing J&J performed. [29] Nor did J&J's recall announcement explain why or how benzene is present in its Defective Sunscreens. [30]  Despite the voluntary recall of these five Neutrogena and Aveeno products and J&J's acknowledgment that its "investigate[on] [of] [the] cause" of the benzene is ongoing, [31] J&J has failed to recall other products identified by Valisure and other independent laboratories as containing dangerously high levels of benzene.

**B.  Benzene—a "Known Human Carcinogen"—Is Heavily Regulated by the FDA and Others.**

36.     Benzene is a chemical which is "highly toxic" to humans, which means it can cause harm by being touched, swallowed, or inhaled. [32]  Medical professionals believe that high levels of benzene can cause blood-based cancers, including leukemia. [33]  Benzene inhibits normal cell function. [34]  Benzene may damage the human immune system by interfering with antibodies and

---

[28] J&J Issues Voluntary Recall, *supra* note 10.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *What Is Benzene?* WEBMD, https://www.webmd.com/beauty/what-is-benzene#1 (last visited Sept. 2, 2021).
[33] *Id.*
[34] *Id.*

white blood cells.[35]  Benzene may cause the human body to create fewer red blood cells, which could lead to anemia.[36]  Benzene may also cause problems with the human nervous system, including damaging nerves.[37]  Exposure to high levels of benzene may make ovaries smaller and cause irregular periods.[38]

37.    Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, and in gasoline, crude oil, and cigarette smoke. The major source of benzene in the United States is petroleum. The health hazards of benzene have been recognized for over one hundred years.

38.    The Environmental Protection Agency considers benzene a "known human carcinogen," which "means it causes cancer in humans."[39]  Likewise, the United States Department of Health and Health Services, United States Food and Drug Administration, World Health Organization, and International Agency for Research on Cancer also consider benzene a carcinogen.

39.    According to the FDA, benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity . . . or deleterious environmental effect."[40]  Where benzene use is "unavoidable in order to produce a drug product with a significant therapeutic advance," its concentration should be limited to no more than 2 ppm.[41]

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] FDA's Q3C Guidance for Industry, *supra* note 6.
[41] *Id.*

40.     The National Institute for Occupational Safety and Health urges protective equipment be worn by any worker who may be exposed to benzene at concentrations of 0.1 ppm for over 10 hours or 1 ppm for 15 minutes, listing "skin absorption" and "skin . . . contact" as ways a person could be exposed to dangerously high levels of benzene.[42]

41.     Before sunscreen products can be sold as over the counter drugs,[43] the FDA regulates sunscreen products to ensure they meet safety and effectiveness standards.[44] The FDA's regulations provide that an "over-the-counter sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets" certain conditions.[45] Per the FDA regulations governing Defendant's Defective Sunscreens, titled "Sunscreen Drug Products for Over-the-Counter Human Use,"[46] there are certain suitable active ingredients in products that are labeled as sunscreen.[47] Benzene is not among the permitted active ingredients for sunscreen.[48] Nor is benzene a suitable inactive ingredient for sunscreen, as inactive ingredients must be "safe in the amounts administered."[49] Nor is benzene identified as an active or inactive ingredient on any of the Defective Sunscreens.  Nevertheless, Defendant falsely and misleadingly advertised that their sunscreen products' ingredients are safe and effective.

---

[42] National Institute for Occupational Safety and Health (NIOSH), *Benzene*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/niosh/npg/npgd0049.html (last updated Oct. 30, 2019).

[43] 21 C.F.R. § 352, *et seq.*

[44] *See generally* 21 CFR §§ 352.1–352.77.

[45] 21 C.F.R. § 352.1(a).

[46] *Id.*

[47] *Sunscreen: How to Help Protect Your Skin from the Sun*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun.

[48] 21 C.F.R. § 352.10 ("Sunscreen Drug Products for over-the-Counter Human Use: Sunscreen active ingredients.").

[49] 21 C.F.R. § 330.1(h) ("General conditions for general recognition as safe, effective, and not misbranded.").  Since it lacks any therapeutic benefit, benzene should not be used in sunscreens.

**C. Defendant Deceptively Sold and Sells Its Carcinogenic Products to Consumers.**

42.     FDA regulations provide that "[a]n over-the-counter sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets each condition in this part and each general condition established in 330.1 of this chapter."[50] Defendant failed to meet this standard.

43.     Federal law[51] and Florida state law[52] prohibit the manufacture of any misbranded or adulterated drug.

44.     Introducing any misbranded or adulterated drug into commerce is similarly prohibited.[53]

45.     The receipt in interstate commerce of any misbranded or adulterated drug is also prohibited.[54]

46.     A drug is deemed adulterated "[i]f it consists in whole or in part of any filthy, putrid, or decomposed substance; or . . . whereby it may have been rendered injurious to health . . . ."[55]

47.     A drug is deemed misbranded "[i]f its labeling is false or misleading in any particular"[56]; [i]f the labeling does not contain, *inter alia*, "the proportion of each active ingredient

---

[50] 21 CFR § 352.1.
[51] 21 CFR § 331(g).
[52] *See* Fla. Stat. § 499.005(1) ("It is unlawful for a person to perform or cause the performance of any of the following acts in this state: (1) The manufacture, repackaging, sale, delivery, or holding or offering for sale of any drug, device, or cosmetic that is adulterated or misbranded or has otherwise been rendered unfit for human or animal use.").
[53] 21 U.S.C. § 331(a); *see also* Fla. Stat. § 499.005(1).
[54] 21 U.S.C. § 331(c); *see also* Fla. Stat. § 499.005(3).
[55] 21 U.S.C. § 351(a)(2)(B); *see also* Fla. Stat. §§ 499.006(1) & (2) ("A drug or device is adulterated, if any of the following apply: (1) It consists in whole or in part of any filthy, putrid, or decomposed substance[;] (2) It has been produced, prepared, packed, or held under conditions whereby it could have been contaminated with filth or rendered injurious to health.").
[56] 21 U.S.C. § 352(a)(1); *see also* Fla. Stat. § 499.007(1) (A drug is misbranded "[i]f its labeling is in any way false or misleading.").

16

. . . [and] inactive ingredient listed in alphabetical order on the outside container of the retail package"[57]; or "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[58]

48.     A drug is deemed misbranded when a manufacturer drug label omits ingredients.[59]

49.     Defendant's Defective Sunscreens are adulterated and misbranded because Defendant did not disclose that benzene may be present in the Defective Sunscreens purchased by Plaintiff and the Class Members.  Because there is simply "no safe level of [benzene] exposure,"[60] benzene is unsuitable for human application as an ingredient in any sunscreen products.

50.     Defendant wrongfully advertised and sold the Defective Sunscreens without proper labeling to indicate to Plaintiff and the Class Members that the Defective Sunscreens may contain benzene:

---

[57] 21 U.S.C. § 352(e)(1)(A)(ii)-(iii); *see also* Fla. Stat. § 499.007(2)(b) ("A drug or device is misbranded: … (2) If in package form, it does not bear a label containing: (b) An accurate statement of the quantity of the contents in terms of weight, measure, or numerical count.").

[58] 21 U.S.C. § 352(j); *see also* Fla. Stat. § 499.007(10) (A drug is misbranded "[i]f it is dangerous to health when used in the dosage or with the frequency or duration prescribed, recommended, or suggested in the labeling of the drug.").

[59] 21 C.F.R. § 201.6. "The labeling of a drug may be misleading by reason (among other reasons) of[] . . . [f]ailure to reveal the proportion of, or other fact with respect to, an ingredient present in such drug, when such proportion or other fact is material in the light of the representation that such ingredient is present in such drug." 21 C.F.R. § 201.10(2); *see also* Fla. Stat. § 499.007(2)(b) ("A drug or device is misbranded[] . . . [i]f in package form, it does not bear a label containing[] . . . [a]n accurate statement of the quantity of the contents in terms of weight, measure, or numerical count.").

[60] *Exposure to Benzene: A Major Public Health Concern*, WORLD HEALTH ORG. (2010), https://www.who.int/ipcs/features/benzene.pdf.



51.     The presence of benzene in the Defective Sunscreens is particularly outrageous since J&J has continuously touted the safety and efficacy of its sunscreens, such as its Neutrogena sunscreen products advertised as "#1 Dermatologist Recommended."

52.     The advertising and packaging for Neutrogena emphasizes the brand's safety and health benefits, including the Defective Sunscreen Neutrogena Ultra Sheer repeatedly marketed and advertised as "clean."

53.     Similar commercial advertisements appear for Neutrogena Ultra Sheer, starring actress Jennifer Garner, telling consumers the Defective Sunscreen is a "#1 Dermatologist Recommended Suncare." These commercials also emphasize the "clean" feel of the product and declare it "the best for your skin."

54.     The Defective Sunscreens are also advertised for use on children, such as the commercials for the Neutrogena Beach Defense line portraying children being sprayed with the Defective Sunscreens while promoting the Neutrogena sunscreen as the "sun care brand used most by dermatologists and their families."

55.     Neutrogena's website continues to advertise as "#1 Dermatologist Recommended" with an entire page dedicated to "Neutrogena Product Testing" as "leading the way."[61] Neutrogena's website states: "We set a high bar for using ingredients" which are "screened for quality, manufacturing process, government regulations, published research and our own ingredient safety databases."[62] The website also claims "[s]afety goes beyond the ingredient list" with a focus on "how our ingredients are used, our manufacturing safeguards, how the products are used, and testing requirements for our products."[63]

56.     Defendant has engaged, and continues to engage, in deceptive, untrue, and misleading advertising by "promising" consumers, *inter alia*, that "safety is paramount" to Defendant,[64] that Defendant "strive[s] to avoid unnecessary and harsh ingredients" and "prioritize ingredients that are [] safe for [consumers'] skin,"[65] and that "the sunscreen ingredients [Defendant] use are safe and effective,"[66] when in reality, unbeknownst to consumers, Defendant's sunscreen products contain an ingredient known to be a human carcinogen—benzene.

---

[61] Neutrogena, *About Us,* https://www.neutrogena.com/about-us.html (last visited Sept. 2, 2021).
[62] *Id.*
[63] Neutrogena, *Product Testing,* https://www.neutrogena,com/producttesting.html (last visited Sept. 2, 2021).
[64] Neutrogena, *Our Promise*, https://www.neutrogena.com/our-promise.html (last visited Sept. 2, 2021).
[65] *Id.*
[66] *Id.*

57.     Defendant even emphasized that what "we include in our products is just as important as what we exclude from them."[67] Despite claiming that they try to avoid using unnecessary and harsh ingredients, the Defective Sunscreens sold to consumers contain carcinogenic benzene.  This advertisement continues to be used on their website:



58.     Neutrogena's website touts that it "not only follow[s] individual country regulations, but also look[s] to incorporate the best thinking and practices from top authorities for skincare products around the world."[68]

59.     Shockingly, Neutrogena's website continues to claim to be the "#1 leader in suncare" promoting a "Commit[ment] to Your Health" through the "power of our Neutrogena

---

[67] *Understanding the FDA's Proposed Rule for Sunscreens*, NEUTROGENAMD (2019), https://www.neutrogenamd.com/sites/neutrogenahcp_us/files/20190416-fda-proposal-guide-3b.cocoon.pdf.
[68] Neutrogena, *Product Testing*, *supra* note 63.

brand to educate and encourage everyday healthy habits and address skincare concerns"[69] even as J&J's products are being recalled for carcinogenic benzene.  The website promotes the image of a woman in the sun claiming they are "focused on driving critical behavior change and sun protection awareness to address preventable skin cancers" even as the products J&J is selling to prevent skin cancer contain a carcinogen:



60.    Defendant even created the "Choose Skin Health" campaign, launched by Neutrogena; Defendant claimed the campaign was "created to change the future of skin health and

---

[69] Neutrogena, *Our Promise*, *supra* note 64.

reduce the risk of skin cancer through education, empowerment, and early detection."[70] Several celebrities have filmed spots for the campaign, including Ms. Kristen Bell,[71] Ms. Jennifer Garner and Ms. Kerry Washington.  In one video, Ms. Garner emphasized the statistics on skin cancer and stated that she chooses Neutrogena-branded products because "[she] choose[s] skin health." In another video, Ms. Garner stated that, every day, she wears Neutrogena Ultra Sheer 45—which comes from the same product line as those found to contain benzene—because she chooses "skin health."

61.     Ms. Washington told viewers in another similar video to "[p]rotect yourself and those you love. Choose skin health for a lifetime of healthy skin."  Unfortunately, for those who choose Neutrogena and its benzene-containing Defective Sunscreens to protect their skin health, they are actually being exposed to its detrimental and dangerous health effects.

62.     Defendant's spokespersons continually emphasized the importance of continuously applying sunscreen products as a means to reduce the risk of skin cancer.[72]  J&J Group Brand Director for Neutrogena Suncare, SuzyDePrizio, even stated: "At Neutrogena, we are driven by the dream of reducing the risk of skin cancer to the smallest number possible—zero."[73]

63.     J&J's Aveeno-branded sunscreen products have a very similar branding to Neutrogena. Aveeno-branded products, including the Defective Sunscreens, are advertised and marketed as having been "Dermatologist recommended for over 65 years."

---

[70] PR Newswire, *Kristen Bell Wants You to Have "The Talk" With Your Children—About Sunscreen: Neutrogena® Launches 2016 Choose Skin Health® Campaign with Help from Brand Ambassador* (May 27, 2016), MULTIVU, http://www.multivu.com/players/English/7847951-neutrogena-choose-skin-health/.
[71] *Id.*
[72] *Id.*
[73] *Id.*

64.     The Aveeno website touts the health benefits of its Defective Sunscreens.[74] The website advertises that the Defective Sunscreens provide "Healthy Skin, Naturally: Nature fuels our healthy spirit, just like healthy skin fuels yours. We research and work with scientists and dermatologists around the world to unlock therapeutic power of nature's most restorative ingredients, giving you clinically-proven products that nurture and care for your skin, so you can care for what's most important in life."[75] The webpage further explains that Aveeno was founded by two brothers who believed that "nature holds the secret to human health" after "[t]he famous Mayo Clinic dermatologists recognized [the brothers'] pioneering work."[76]

65.     In its "Commitment to Wellness" section, J&J's Aveeno website advises visitors: "'Good enough' is never good enough for Aveeno®. Our internal standards for safety testing and ingredient quality far exceed those set by regulators around the world. We think about every element we use in every one of our products—where it came from, what it does and how it impacts you and your skin. Only ingredients that pass our strict 5-step safety assurance process are used."

66.     In addition to the claims, it makes in its Neutrogena and Aveeno websites, J&J also promises a "Safety & Care Commitment."  Part of J&J's commitment is the following statement: "Your safety is our priority. That's why our safety assessment process meets or exceeds industry and regulatory standards for baby and beauty personal care products. It's a process that never ends— we continually review our product ingredients against the latest research and consumer feedback. We believe our process is among the most rigorous in the world and is at the core of our Safety & Care Commitment."

---

[74] Johnson & Johnson Consumer Inc., *About Aveeno*, https://www.aveeno.com/about (last visited Sept. 2, 2021).
[75] *Id.*
[76] *Id.*

67.     J&J's "Safety & Care Commitment means that every product is carefully reviewed and evaluated against internationally recognized standards."

68.     J&J misled and defrauded consumers by making affirmative misrepresentations that portray the Defective Sunscreens as safe and therapeutic, and omitting from the Defective Sunscreens' packaging, labeling, and marketing materials information about the actual danger of the Defective Sunscreens, including warning consumers that the Defective Sunscreens may contain unacceptable levels of cancer-causing benzene, rendering them dangerous, adulterated, misbranded, and illegal.  J&J's complete failure to prevent the presence of benzene in the Defective Sunscreens constitutes actionable fraud.

69.     Benzene is not required as an active or inactive ingredient in the Defective Sunscreens, and even if it were, many of the Defective Sunscreens still contain more than the FDA's 2 ppm concentration limit.

70.     Because the Defective Sunscreens expose consumers and users to benzene levels well above FDA's legal limit, the sunscreens are not fit for use by humans or the use for which the sunscreens were intended.  The Defective Sunscreens are adulterated, misbranded, illegal, and unfit for sale in trade or commerce, rendering them worthless and without any value.[77]

---

[77] *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927 (11th Cir. 2020) (reasoning that even if plaintiffs suffer no physical harm from an adulterated dietary supplement as defined by the Food, Drug, and Cosmetic Act, "they were sold a worthless product 'that Congress judged insufficiently safe for human ingestion,'" depriving the plaintiffs of the benefit of their bargain, amounting to a direct economic loss) (quoting *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1080-86 (11th Cir. 2019)); *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 2875, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of their dangerousness caused by their contamination, regardless [sic] whether the sold [drugs] actually achieved the medical purpose of lowering blood pressure.  Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for.").

71.     Plaintiff and the Classes purchased the Defective Sunscreens because they believed them to be free of benzene. Plaintiff and the Classes would not have purchased the Defective Sunscreens had the sunscreens been truthfully and accurately labeled.  Accordingly, Plaintiff and the Classes were injured by paying the full purchase price of the Defective Sunscreens and were deprived of the benefit of their bargain.

**D. Defendant Knew Or Should Have Known Of The Dangers Associated With The Defect.**

72.     Given the dangerous characteristics of benzene and the industry's knowledge of skin absorption, Defendant knew or should have known of the Defect in its Defective Sunscreens. This is especially true given the recalls and lawsuits J&J has faced with the safety of its other products in recent years.  For example, after the FDA discovered evidence of asbestos, another known carcinogen, in J&J's baby powder in 2019, J&J issued a voluntary recall of only some of its talc-based baby powders.[78]  After dragging its feet for almost a year after its recall, J&J ultimately discontinued all of its talc-based baby powders in the United States and Canada.[79] This took place almost two years after the New York Times reported that "internal [J&J] memos and reports . . . document executives' concerns about potential contamination that date back 50 years."[80]  Even as J&J continued to defend the safety of its products based on "'routine tests,'" the

---

[78] *Johnson & Johnson Consumer Inc. to Voluntarily Recall A Single Lot of Johnson's Baby Powder in the United States*, U.S. FOOD & DRUG ADMIN. (Oct. 18, 2019), https://www.jnj.com/johnson-johnson-consumer-inc-to-voluntarily-recall-a-single-lot-of-johnsons-baby-powder-in-the-united-states.

[79] *Johnson & Johnson Consumer Health Announces Discontinuation of Talc-based Johnson's Baby Powder in U.S. & Canada*, U.S. FOOD & DRUG ADMIN. (May 19, 2020), https://www.jnj.com/our-company/johnson-johnson-consumer-health-announces-discontinuation-of-talc-based-johnsons-baby-powder-in-u-s-and-canada.

[80] *Johnson & Johnson Recalls Baby Powder Over Asbestos Worry*, N.Y. TIMES (Oct. 18, 3029), https://www.nytimes.com/2019/10/18/business/johnson-johnson-baby-powder-recall.html (hereinafter "J&J Recalls Baby Powder").

New York Times described internal J&J documents painting a different picture, including one memo where J&J "demanded that the government block unfavorable findings from being made public" before an official at the FDA assured J&J that "the findings would be issued only 'over my dead body.'".[81]   After facing such a public scandal regarding so many carcinogenic contamination complaints, J&J's testing should have, if it did not already, identify issues with carcinogenic contamination in its other products.[82]

73.   "The toxicity of benzene in humans has been well established for over 120 years," as "[t]he hematotoxicity of benzene has been described as early as 1897.".[83]   A 1939 study on benzene found that "'exposure over a long period of time to any concentration of benzene greater than zero is not safe,'[84] which is a comment reiterated in a 2010 review of benzene research specifically stating '[t]here is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion.'"[85]

74.   "'There is not a safe level of benzene that can exist in sunscreen products,' stated Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University.  'Even

---

[81] *Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years*, N.Y. TIMES (Dec. 14, 2018), https://www.nytimes.com/2018/12/14/business/baby-powder-asbestos-johnson-johnson.html.

[82] Aside from the claims of asbestos contamination in its baby products, J&J has also recently faced significant lawsuits regarding deceptive marketing of its products.  For example, in 2019, the New York Times also reported that J&J had agreed to pay $117 million in a settlement over the deceptive marketing of transvaginal pelvic mesh implants, and that J&J had been ordered to pay $8 billion in a lawsuit where J&J had been accused of downplaying the risks associated with its antipsychotic drug. *Johnson & Johnson Recalls Baby Powder Over Asbestos Worry*, N.Y. TIMES (Oct. 18, 3029), https://www.nytimes.com/2019/10/18/business/johnson-johnson-baby-powder-recall.html.

[83] VALISURE NEWS, *supra* note 8.

[84] *Id.*

[85] *Id.*; *see also* Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANN. REV. PUB. HEALTH 133-148 (2010), *https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.*

benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene.'"[86]

75.     Indeed, in a 2019 study on sunscreen ingredients, FDA researchers stated: "Understanding the extent of systemic exposure of [sunscreen] products is important, as even a low percentage of systemic absorption (*e.g.*, 0.1%) could represent a significant systemic exposure (*e.g.*, milligrams of ingredient being systemically absorbed per day)."[87]

76.     A 1997 study by Health Canada's Bureau of Chemical Hazards shows that the "application of sunscreen specifically increases the absorption rate of benzene through the skin."[88]

77.     The presence of benzene in the Defective Sunscreens is particularly dangerous due to the continuous and long-term use of sunscreen.  A single application of sunscreen includes 25-30 grams of sunscreen.[89]  Since sunscreen needs to be reapplied every 80-120 minutes, or after swimming or sweating, people could use 90-120 grams of sunscreen a day.[90]  With that in mind, Dr. Christopher Bunick, a Yale Medicine dermatologist and associate professor at Yale School of Medicine, questioned: "Add up such exposures over years of sunscreen use, and therein lies the question facing dermatologists and sunscreen consumers—does proper sunscreen use, which is

---

[86] VALISURE NEWS, *supra* note 8.

[87] Murali K. Matta, PhD, et al., *Effect of Sunscreen Application Under Maximal Use Conditions on Plasma Concentration of Sunscreen Active Ingredients: A Randomized Clinical Trial*, 321 JAMA 2082-91 (2019), https://jamanetwork.com/journals/jama/fullarticle/2733085.

[88] VALISURE NEWS, *supra* note 8; *see also* J.S. Nakai, et al., *Effect of environmental conditions on the penetration of benzene through human skin*, 51 J. TOXICOLOGY ENVTL. HEALTH 447-462 (1997), https://pubmed.ncbi.nlm.nih.gov/9233379/.

[89] Julia Ries, *Why J&J Is Recalling Several Sunscreen Brands: What to Know*, HEALTHLINE (July 19, 2021), https://www.healthline.com/health-news/why-jj-is-recalling-several-sunscreen-brands-what-to-know.

[90] *See id.*

essential for preventing sun-induced skin cancers, over years of one's lifetime lead to a chronic exposure to significant levels to increase risk of blood or internal cancers."[91]

78.     Thus, Defendant's conduct is substantially injurious to consumers due to the nature of sunscreen. Consumers are purchasing and as directed to in the label, "apply[ing] liberally" Defendant's Defective Sunscreens without knowledge that they may have been adulterated with a human carcinogen. Defendant's false labeling, advertising, and promotion has caused and continues to cause, substantial injury to consumers because consumers would not have paid for sunscreens potentially containing benzene.

79.     Despite the presence of benzene in the Defective Sunscreens, Defendant failed to list benzene as an active or inactive ingredient on any of the labels of the Defective Sunscreens or disclose the use or presence of benzene in any of its marketing of its "sunscreen" products. Defendant's representation on its sunscreen labels that the Defective Sunscreens only contained ingredients which were explicitly listed, has proven to be false, and Defendant failed to make known that the Defective Sunscreens were adulterated with benzene, a known human carcinogen.

80.     Nor does Defendant's use or presence of benzene in its Defective Sunscreens fall within the FDA's exception allowing the "unavoidable" use of benzene for drugs "with a significant therapeutic advance" described above.  "Because many of the sunscreen products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance; therefore, any significant detection of benzene should be deemed unacceptable."[92]

---

[91] *Id.*
[92] VALISURE, *supra* note 9.

## THE STATUTE OF LIMITATIONS

**A.      Defendant's Fraudulent Concealment Tolled the Statute of Limitations.**

77.      Upon information and belief, Defendant knew or should have known about the Defect for several years.  As part of its routine and continuous testing of its products, Defendant knew or should have known of the presence of benzene in its Defective Sunscreens.  Defendant's fraudulent concealment tolled the statute of limitations on the claims asserted by Plaintiff Pedron and the Classes.

78.      Under the fraudulent concealment doctrine, the claims of Plaintiff Pedron and members of the Classes only accrue upon the discovery that Defendant deceived them into purchasing the Defective Sunscreens, which contains and contained carcinogenic benzene.

79.      Defendant kept Plaintiff Pedron and Class Members in the dark by concealing crucial information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiff Pedron and Class Members did not discover and could not discover through the exercise of reasonable diligence, the presence of benzene in Defective Sunscreens, and therefore were unaware of Defendant's deception.

80.      Plaintiff Pedron and members of the Classes were unaware of Defendant's deceptive conduct and did not know that they were purchasing products containing benzene. Plaintiff Pedron and Class Members would not have purchased the Defective Sunscreens had they known they contained benzene. No information, actual or constructive, was ever made available to Plaintiff Pedron and members of the Classes that they were being injured by Defendant's unlawful conduct.

81.     Notably, none of the Defective Sunscreens list benzene as an active or inactive ingredient, and the FDA significantly limits the use of benzene. Benzene has no therapeutic purpose in sunscreens, and therefore should not have been present in the Defective Sunscreens.

82.     Furthermore, Defendant's advertising, labeling, and branding stress the healthy and safe nature of their products, including the Defective Sunscreens. Nothing in the advertising, labeling, and branding materials would suggest that the Defective Sunscreens contained benzene.

83.      Because the presence of benzene was not disclosed to customers until Valisure announced its findings in May 2021, Plaintiff Pedron and members of the Classes had no knowledge of Defendant's deception, or of any facts or information that would have caused a reasonably diligent person to investigate whether there was such deception, until at least May 2021.

84.     Any applicable statute of limitations has therefore been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B. Defendant is Estopped From Relying On Any Statute of Limitations in Defense of This Action.**

85.     Defendant was, and is, under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Defective Sunscreens.  Defendant actively concealed the true character, quality, and nature of the vehicles; and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Defective Sunscreens.  Plaintiff and Class Members reasonably relied upon Defendant's knowing and affirmative misrepresentations, and/or active concealment, of these facts.  Based on the foregoing, Defendant is estopped from relying on any statute of limitations in defense of this action.

**C.      The Statute of Limitations Did Not Begin to Run Because Plaintiff Pedron Did Not and Could Not Discover Defendant's Unlawful Conduct.**

86.      The causes of action alleged herein did not accrue until Plaintiff Pedron and Class Members discovered that their sunscreens contained the Defect.

87.      Plaintiff Pedron and Class Members, however, had no realistic ability to discern that the sunscreens were defective, until—at the earliest—Valisure announced its findings in May 2021, or their sunscreens were recalled by J&J in July 2021.  No information concerning the presence of benzene in the Defective Sunscreens was in the public domain or available to Plaintiff Pedron and members of the Classes until May 2021.  Even then, Plaintiff and Class Members would have had no reason to discover their causes of action because of Defendant's active concealment of the true nature of the Defect, and prior knowledge of it.

## CLASS ACTION ALLEGATIONS

88.      Plaintiff Pedron has standing to represent Class Members because there is sufficient similarity between the specific Defective Sunscreens purchased by Plaintiff Pedron and the other Sunscreen Products not purchased by Plaintiff Pedron. Specifically, each and every one of the Defendant's Defective Sunscreens (i) are marketed in substantially the same way—as "Sunscreen"—and (ii) fail to include labelling indicating to consumers that the Defective Sunscreens may contain benzene as an active or inactive ingredient. Accordingly, the misleading effect of all of the Defective Sunscreens is substantially the same.

89.      Moreover, Plaintiff Pedron and the Classes' claims all derive directly from a single course of conduct by Defendant. This case is about the responsibility of Defendant, at law and in equity, for its knowledge, conduct, and products. Defendant has engaged in uniform and standardized conduct toward Plaintiff Pedron and the Classes.  They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions,

among individual Class Members. The objective facts on these subjects are the same for all Class Members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Accordingly, Plaintiff Pedron brings this lawsuit as a class action on his own behalf, and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### A.    <u>The Classes</u>

90.    Plaintiff Pedron brings this action and seeks to certify and maintain it as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3); on behalf of herself and a National Class defined as follows:

**<u>National Class</u>**

All consumers who purchased any Defective Sunscreens in the United States of America and its territories for personal use or consumption.

91.    Plaintiff Pedron also alleges statewide class action claims on behalf of herself and all other similarly situated Florida consumers pursuant to Rule 23(a), (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Sub-Class:

**<u>Florida Sub-Class</u>**

All consumers who purchased any Defective Sunscreens in the State of Florida for personal use or consumption.

92.    The proposed National Class and Florida Sub-Class and their members are sometimes referred to herein as the "Class" or "Classes."

93.    Excluded from each Class are Defendant, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of

Defendant; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

      **B.**    <u>**Numerosity**</u>

94.      The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. Plaintiff Pedron is informed and believes that the proposed Class/Sub-Classes contains thousands of purchasers of Defendant's Defective Sunscreens who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff Pedron at this time.

      **III.**    <u>**Predominance of Common Issues**</u>

95.      This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3), because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class Members.

96.      Plaintiff Pedron's claims are typical to those of all Class Members because members of the Class are similarly injured through Defendant's uniform misconduct above and were subject to Defendant's Defective Sunscreens claims that accompanied each and every sunscreen product in the Neutrogena collection. Plaintiff Pedron is advancing the same claims and legal theories on behalf of herself and all members of the Class/Sub-Class.

97.      Plaintiff Pedron's claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class Members. The claims of Plaintiff Pedron and all prospective Class Members involve the same alleged defect. These common legal and factual questions include the following:

      (a)    Whether the Defective Sunscreens suffer from the Defect;

      (b)    Whether Defendant knew, or should have known, about the Defect, and, if so, how long Defendant has known of the Defect;

(c)     Whether Defendant had a duty to disclose the defective nature of the Defective Sunscreens to Plaintiff and Class Members;

(d)     Whether Defendant omitted and failed to disclose material facts about the Defective Sunscreens;

(e)     Whether Defendant's omissions are true, are misleading, or are objectively reasonably likely to deceive;

(f)     Whether Defendant's concealment of the true defective nature of the Defective Sunscreens induced Plaintiff and Class Members to act to their detriment by purchasing and/or using the Defective Sunscreens;

(g)     Whether Defendant's conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

(h)     Whether Defendant misrepresented that the Defective Sunscreens were safe;

(i)     Whether Defendant engaged in unfair, deceptive, unlawful, and/or fraudulent acts or practices, in trade or commerce, by failing to disclose that the Defective Sunscreens were designed, manufactured, distributed, and/or sold with the Defect;

(j)     Whether Defendant's conduct, as alleged herein, was likely to mislead a reasonable consumer;

(k)     Whether Defendant's statements, concealments, and omissions regarding the Defective Sunscreens were material, in that a reasonable consumer could consider them important in purchasing or using such sunscreens;

(l)     Whether Defendant violated each of the states' consumer protection statutes, and if so, what remedies are available under those statutes;

(m)     Whether the Defective Sunscreens were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

(n)     Whether Defendant's unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

(o)     Whether Defendant's conduct constitutes violations of the laws asserted;

(p)     Whether Defendant's conduct violates public policy;

(q)     Whether Defendant has been unjustly enriched by its conduct;

(r)     Whether Plaintiff Pedron and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

(s)     Whether Plaintiff Pedron and the Classes are entitled to a declaratory judgment stating that the Defective Sunscreens are defective and/or not merchantable;

(t)     Whether Defendant should be declared responsible for notifying all Class Members of the Defect, and ensuring that all vehicles with the Defect are promptly recalled and replaced;

(u)     What aggregate amounts of statutory penalties are sufficient to punish and deter Defendant, and to vindicate statutory and public policy;

(v)     How such penalties should be most equitably distributed among Class Members.

**C.     Typicality**

98.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3), because Plaintiff Pedron's claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendant. The relief Plaintiff Pedron seeks is typical of the relief sought for the absent Class Members.

**D.     Adequate Representation**

99.     Plaintiff Pedron and her counsel will fairly and adequately protect and represent the interest of each member of the class. Plaintiff Pedron has retained counsel with substantial experienced in prosecuting consumer class actions, including actions involving defective products.

100.     Plaintiff Pedron and her counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff Pedron nor her counsel have interests adverse to those of the Classes, nor is Plaintiff Pedron subject to any unique defenses.

**E.     Superiority**

101.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2), because Defendant has acted, and refused to act, on grounds generally applicable to each Class, thereby

making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

102.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendant's conduct and responsibility predominate over any questions affecting only individual Class Members.

103.     Because the damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation—by even a small fraction of the Classes— would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

104.     The Classes also may be certified because Defendant has acted or refused to act on grounds applicable to the Classes, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Classes as a whole.

105.     The conduct of this action as a class action: presents far fewer management difficulties; far better conserves judicial resources and the parties' resources; and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of

class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

106.     Plaintiff Pedron is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Federal Rule of Civil Procedure 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.  The Court may, on motion of Plaintiff, or on its own determination, certify nationwide, statewide, and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law, for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

107.     Plaintiff Pedron seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell Defective Sunscreens that may be adulterated with benzene and requiring Defendant to provide a full refund of the purchase price of the Defective Sunscreens to Plaintiff Pedron and Class Members.

108.     Unless a Class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiff Pedron and the Class Members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and general public will continue to be misled. Indeed, to this day, Defendant continues to market and sell Defective Sunscreens found by Valisure to be adulterated with benzene.

## FIRST CAUSE OF ACTION
### Violation of Florida's Deceptive and Unfair Trade Practices Act
### Fla. Stat. §§ 501.201-213
### (On Behalf of the Plaintiff Pedron and the Florida Sub-Class)

109.     Plaintiff Pedron incorporates by reference and re-alleges the allegations contained in paragraphs 1-108 as though fully set forth herein.

110.     Plaintiff Pedron brings this Count individually and on behalf of the Florida Sub-Class.

111.     Plaintiff is a "consumer" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

112.      Defendant is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

113.     The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).  J&J participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

114.     Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

115.     In the course of its business, J&J willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Defect discussed above.  J&J compounded the deception by repeatedly asserting that the Defective Sunscreens were safe, effective, and of high quality and by claiming to be a reputable manufacturer that values health and safety.

116.    Defendant also engaged in unlawful trade practices by deception, deceptive acts or practices, fraud, or misrepresentations or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

117.    On information and belief, following routine testing and inspection of its products and/or manufacturing facilities, Defendant was aware or should have been aware of the presence of benzene within its Defective Sunscreens.  Defendant willfully failed to disclose and actively concealed the dangerous risks posed by the Defective Sunscreens.

118.    By failing to disclose and by actively concealing the Defect in its Defective Sunscreens, by marketing them as safe, effective, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the FDUTPA.  Defendant deliberately withheld the information about the Defective Sunscreen's use or inclusion of benzene, which harmed sunscreen users by exposing them to the carcinogenic benzene, instead of protecting users from skin cancer.

119.    In the course of J&J's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Defect discussed above.  J&J compounded the deception by repeatedly asserting that the Defective Sunscreens were safe, effective, and of high quality and by claiming to be a reputable manufacturer that values health and safety.

120.    J&J's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers,

including Plaintiff and the Florida Sub-Class Members, about the true safety and reliability of the Defective Sunscreens, the quality of J&J's brands, and the true value of the Defective Sunscreens.

121.     J&J intentionally and knowingly misrepresented material facts regarding the Defective Sunscreens with an intent to mislead Plaintiff and the Florida Sub-Class Members.

122.     J&J knew or should have known that its conduct violated the FDUTPA.

123.     As alleged above, J&J made material statements about the safety and reliability of the Defective Sunscreens that were either false or misleading.  J&J's representations, omissions, statements, and commentary have included selling and marketing the Defective Sunscreens as safe and reliable, despite its knowledge of the Defect or J&J's failure to reasonably investigate it.

124.     To protect profits and to avoid remediation costs and a public relations nightmare, J&J concealed the dangers and risks posed by the Defective Sunscreens and allowed unsuspecting sunscreen users to continue to purchase the Defective Sunscreens and continue to use and share the use of said products with others.

125.     J&J owed Plaintiff Pedron and the Florida Sub-Class Members a duty to disclose the true safety and reliability of the Defective Sunscreens because J&J:

    a.   possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.   intentionally concealed the foregoing from Plaintiff Pedron and the Florida Sub-Class Members; and/or

    c.   made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff Pedron and the Florida Sub-Class Members that contradicted these representations.

126.     J&J's failure to disclose and active concealment of the dangers and risks posed by the Defective Sunscreens were material to Plaintiff and the Florida Sub-Class Members.

127.     Because the Defective Sunscreens contain benzene, they are worthless.

128.     Plaintiff Pedron and the Florida Sub-Class Members suffered ascertainable loss caused by J&J's misrepresentations and its failure to disclose material information.  Had Plaintiff Pedron and the Florida Sub-Class Members been aware of the Defect and J&J's complete disregard for safety, Plaintiff Pedron and the Florida Sub-Class Members would never have purchased their Defective Sunscreens.  Plaintiff and the Florida Sub-Class Members did not receive the benefit of their bargain as a result of J&J's misconduct.

129.     Plaintiff Pedron and the Florida Sub-Class Members risk irreparable injury as a result of J&J's acts and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiff Pedron, the Florida Sub-Class Members, and the general public.  J&J's unlawful acts and practices complained of herein affect the public interest.

130.     As a direct and proximate result of J&J's violations of the FDUTPA, Plaintiff Pedron and the Florida Sub-Class Members have suffered injury-in-fact and/or actual damage.

131.     Plaintiff Pedron and the Florida Sub-Class Members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

132.     Plaintiff Pedron and the Florida Sub-Class Members also seek an order enjoining J&J's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

133.     As alleged herein, Plaintiff Pedron and the Sub-Class Members have lost money and suffered injury in fact due to the Defendant's conduct because they purchased Defective Sunscreens from Defendant in reliance on Defendant's representation that the ingredients in their Defective Sunscreens were safe and effective and were not adulterated with benzene, a known human carcinogen.

134.     As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff Pedron and the Sub-Class Members to damages and relief under Fla. Stat. §§ 501.201-213.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of the National Class and Florida Sub-Class)

135.     Plaintiff Pedron incorporates by reference and re-alleges the allegations contained in paragraphs 1-108 as though fully set forth herein.

136.     As a result of Defendant's wrongful and deceptive conduct alleged herein, Defendant knowingly and voluntarily accepted and retained wrongful benefits in the form of money paid by Plaintiff Pedron and members of the Classes when they purchased the Defective Sunscreens.

137.     In so doing, Defendant acted with conscious disregard for the rights and safety of Plaintiff Pedron and members of the Classes.

138.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff Pedron and members of the Classes.

139.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

140.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from the false and deceptive labeling and marketing of the Defective Sunscreens to Plaintiff Pedron and members of the classes.

141.     Defendant's retention of such funds under the circumstances would make it unfair and inequitable and to do so constitutes unjust enrichment.

142.     The financial benefits derived by Defendant rightfully belonged to Plaintiff Pedron and members of the Classes.

143.     Defendant should be compelled to place into a  common fund for the benefit of Plaintiff Pedron and members of the Classes all wrongful or inequitable proceeds received by them.

144.     Finally, Plaintiff Pedron and members of the Classes may assert an unjust enrichment claim even though a remedy at law may otherwise exist. [93]

### THIRD CAUSE OF ACTION
### Negligent Misrepresentation/Omission
### (On Behalf of the National Class and Florida Sub-Class)

145.     Plaintiff Pedron incorporates by reference and re-alleges the allegations contained in paragraphs 1-108 as though fully set forth herein.

146.     Defendant made representations, through their labeling and advertising, to Plaintiff Pedron and the Class Members concerning the active and inactive ingredients in their Defective Sunscreens.

147.     Defendant has a duty to provide accurate information to consumers with respect to the ingredients identified in their Defective Sunscreens as detailed above.

---

[93] *See State Farm Mut. Auto Ins. Co. v. Physicians Injury Care Ctr.*, 427 F. App'x 714, 723 (11th Cir. 2011), *rev'd on other grounds*, 824 F.3d 1311 (The general rule that "equitable remedies are not available under Florida law when adequate legal remedies exist . . . does not apply to unjust enrichment claims."); *see also Morris v. ADT Sec. Services*, 580 F. Supp. 2d 1305, 1312-13 (S.D. Fla. 2008); *In re Monat Hair Prods. Mktg., Sales Prac., & Prods. Liab. Litig.*, MDL No. 2841, 2019 WL 5423457, at *5 (S.D. Fla. Oct. 23, 2019); *Garcia v. Clarins USA, Inc.*, No. 14-CV-21249, 2014 WL 11997812, at *5 (S.D. Fla. Sept. 5, 2014); *Goldberg v. Chong*, No. 07-20931, 2007 WL 2028792 at *9 (S.D. Fla. July 11, 2007).

148.     Defendant did not fulfill its duty to accurately disclose in its labeling and advertising that the known carcinogen, benzene was present in the Defective Sunscreens.

149.     Additionally, Defendant has a duty to not make false representations with respect to their Defective Sunscreens.

150.     Defendant failed to fulfill its duty when it made false representations regarding the quality and safety of the Defective Sunscreens as detailed above.

151.     Defendant's failure to disclose the ingredients contained in the sunscreens amount to negligent omissions and the representations regarding the quality and safety of the product amount to negligent misrepresentation.

152.     Plaintiff Pedron and the other members of the Classes reasonably relied upon such representations and omissions to their detriment.

153.     By reason thereof, Plaintiff Pedron and other Class Members have suffered damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty
### (On Behalf of the National Class and Florida Sub-Class)

154.     Plaintiff Pedron incorporates by reference and re-alleges the allegations contained in paragraphs 1-108 as though fully set forth herein.

155.     As detailed above, Defendant, through its written literature, packaging and labeling, and written media advertisement, expressly warranted that the Defective Sunscreens were safe and fit for the purposes intended, that they were of merchantable quality, and they did not pose dangerous health risks.

156.     Moreover, the Defective Sunscreens' labeling (specifically in the "Sun Protection Measures")[94] represents that the regular use of broad spectrum sunscreen is "protective" and that its use can "decrease the risk" of skin cancer and early skin aging. This terminology constitutes an affirmation of fact or promise or a description of the product as being safe and not posing a dangerous health risk. Defendant breached this express warranty because its Defective Sunscreens are not safe. To the contrary, the Defective Sunscreens pose a dangerous health risk because they contain benzene—a chemical that increases the risk of cancer when exposure occurs either through inhalation or skin absorption.

157.     Defendant's packaging and written advertisements contained express warranties which Plaintiff Pedron and other Class Members read and relied upon.

158.     Defendant breached its expressed warranties because the Defective Sunscreens are defective and not reasonably safe for their intended use.

159.     Defendant knew or should have known that the Defective Sunscreens did not comply with the express warranties and representations and that, in fact, the Defective Sunscreens are not safe and pose serious health risks because they contain benzene, a known carcinogen.

160.     Plaintiff Pedron and other Class Members have suffered harm on account of Defendant's breach of its express warranty regarding the fitness for use and safety of the Defective Sunscreens and are entitled to damages to be determined at trial.

---

[94]  Specifically, the "Directions" section of Neutrogena's Beach Defense Sunscreen Product SPF 70 states: "Sun Protection Measures: Spending time in the sun increases your risk of skin cancer and early skin aging. To decrease this risk, regularly use a sunscreen with a Broad Spectrum SPF value of 15 or higher . . . ."

## FIFTH CAUSE OF ACTION
### Breach of Implied Warranty
### (On Behalf of the National Class and Florida Sub-Class)

161.      Plaintiff Pedron incorporates by reference and re-alleges the allegations contained in paragraphs 1-108 as though fully set forth herein.

162.      Because the Defective Sunscreens contained benzene, they were not of the same quality as those generally acceptable in the trade and were not fit for the ordinary purposes for which such Defective Sunscreens were used.

163.      Plaintiff Pedron and members of the Classes purchased the Defective Sunscreens in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

164.      The Defective Sunscreens were not altered by Plaintiff Pedron or members of the Classes.

165.      Plaintiff Pedron and members of the Classes were foreseeable users of the Defective Sunscreens.

166.      Plaintiff Pedron and members of the Classes used the Defective Sunscreens in the manner intended.

167.      The Defective Sunscreens did not measure up to the promises or facts stated in the written literature, media advertisement and communications by and from Defendant.

168.      Defendant impliedly warranted that the Defective Sunscreens were merchantable, fit and safe for ordinary use.

169.       Defendant further impliedly warranted that the Defective Sunscreens were fit for the particular purposes for which they were intended and sold.

170.     Contrary to these implied warranties, the Defective Sunscreens were defective, unmerchantable, and unfit for their ordinary use when sold, and unfit for the particular purpose for which they were sold.

171.     By reason thereof, Plaintiff Pedron and the other Class Members have suffered damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Strict Product Liability – Failure to Warn**
**(On Behalf of the National Class and Florida Sub-Class)**

172.     Plaintiff Pedron incorporates by reference and re-alleges the allegations contained in paragraphs 1-108 as though fully set forth herein.

173.     Defendant knew or should have known that their Defective Sunscreens contained benzene, which is a known carcinogen.

174.     Defendant had a duty to warn Plaintiff Pedron and the other Class Members about the presence of benzene in their Defective Sunscreens.

175.     In addition, Defendant had a duty to warn Plaintiff Pedron and the other Class Members about the dangers of the presence of benzene in their Defective Sunscreens.

176.     Defendant knew that it was not readily recognizable to an ordinary consumer that their Defective Sunscreens put them at  risk of exposure to benzene and that consumers would not inspect the product for benzene content.

177.     No warning was made to Plaintiff Pedron or other Class Members about the Defective Sunscreens containing benzene or about the dangers it presented by the Defendant.

178.     Plaintiff Pedron and the other Class Members suffered damages by purchasing Defective Sunscreens in a manner promoted by Defendant, and in a manner that was reasonably foreseeable by Defendant, because benzene is a known carcinogen that is absorbed through

inhalation and through the skin. Plaintiff Pedron and the members of the Classes would not have purchased Defendant's Defective Sunscreens had they known they contained benzene.

179.     Plaintiff Pedron and the other Class Members were justified in their reliance on Defendant's labeling and advertising of the product for use as sunscreen.

180.     Plaintiff Pedron and the other Class Members have suffered damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Strict Product Liability- Manufacturing Defect**
**(On Behalf of the National Class and Florida Sub-Class)**

181.     Plaintiff Pedron incorporates by reference and re-alleges the allegations contained in paragraphs 1-108 as though fully set forth herein.

182.     The Defective Sunscreens contained a manufacturing defect when they left the possession of Defendant. Specifically, the Defective Sunscreens differ from Defendant's intended result or from other lots of the same product line because they contain benzene.

183.     Plaintiff Pedron and the other Class Members used the Sunscreen Products in a way that was reasonably foreseeable to Defendant

184.      As a result of the defects in the manufacture of the Defective Sunscreens, Plaintiff Pedron and the other Class Members suffered damages.

185.     Accordingly, Plaintiff Pedron and members of the Classes suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Pedron, on behalf of herself and all others similarly situated, prays for judgment against the Defendant as to each and every count, including:

A.   An order declaring this action to be a proper class action, appointing Plaintiff Pedron and her counsel to represent the Class/Sub-Classes, and requiring Defendant to bear the costs of class notice;

B.   An order enjoining Defendant from selling the Defective Sunscreens;

C.   An order enjoining Defendant from suggesting or implying that the Defective Sunscreens are safe and effective for human application;

D.   An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing Defective Sunscreens;

E.   An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.   An order requiring Defendant to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G.   An order requiring Defendant to disgorge any ill-gotten benefits received from Plaintiff Pedron and members of the Class/Sub-Classes as a result of any wrongful or unlawful act or practice;

H.   An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

49

I.      An order awarding attorneys' fees and costs to Plaintiff Pedron and the Class/Sub-Classes; and

J.      An order providing for all other such equitable relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff Pedron demands a trial by jury on all issues triable.

Dated:  September 2, 2021          PODHURST ORSECK, P.A.

<u>**/s/ Peter Prieto**</u>
Peter Prieto (FBN 501492)
John Gravante (FBN 617113)
Matthew P. Weinshall (FBN 84783)
One S.E. Third Ave, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com
       jgravante@podhurst.com
       mweinshall@podhurst.com

*Counsel for Plaintiff*