# U.S. District Court
## Northern District of Alabama (Southern)
## CIVIL DOCKET FOR CASE #: 2:21-cv-01208-JHE

De Los Santos v. Johnson & Johnson et al
Assigned to: Magistrate Judge John H England, III
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 09/03/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

## **Plaintiff**

**Conrad De Los Santos**
*an individual*

represented by **Evan Taylor Rosemore**
Southern Institute for Medical and Legal
Affairs, LLC
2224 1st Avenue North
Birmingham, AL 35203
205-547-5525
Fax: 205-547-5526
Email: evan@southernmedlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Francois M Blaudeau**
SOUTHERN INSTITUTE FOR MEDICAL
AND LEGAL AFFAIRS
2224 1st Ave. North
Birmingham, AL 35203
205-547-5525
Fax: 205-547-5526
Email: francois@southernmedlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Odeh John Issis**
SOUTHERN INSTITUTE FOR MEDICAL
AND LEGAL AFFAIRS
2224 1st Avenue North
Birmingham, AL 35203
205-547-5527
Fax: 205-547-5526
Email: odeh@southernmedlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

## **Defendant**

## **Johnson & Johnson**

## **Defendant**

## **Johnson & Johnson Consumer Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/03/2021 | 1 | COMPLAINT against Johnson & Johnson, Johnson & Johnson Consumer Inc, filed by Conrad De Los Santos. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(AKD) (Entered: 09/03/2021) |
| 09/03/2021 | 2 | **NOTICE OF CONSENT** to a magistrate judge in a civil action. (AKD) (Entered: 09/03/2021) |

<table>
<tr><td colspan="4" align="center"><b>PACER Service Center</b></td></tr>
<tr><td colspan="4" align="center"><b>Transaction Receipt</b></td></tr>
<tr><td colspan="4" align="center">09/03/2021 14:35:12</td></tr>
<tr><td><b>PACER Login:</b></td><td>erosemore:5135616:0</td><td><b>Client Code:</b></td><td>sunscreen</td></tr>
<tr><td><b>Description:</b></td><td>Docket Report</td><td><b>Search Criteria:</b></td><td>2:21-cv-01208-JHE</td></tr>
<tr><td><b>Billable Pages:</b></td><td>1</td><td><b>Cost:</b></td><td>0.10</td></tr>
</table>



FILED

2021 Sep-03  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CONRAD DE LOS SANTOS, an individual, | |
| *Plaintiff* | Case No. |
| *v.* | **Complaint** |
| JOHNSON & JOHNSON; and JOHNSON & JOHNSON CONSUMER, INC., | *Jury Trial Demanded* |
| *Defendants* | |

Submitted:   September 3, 2021



François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
Odeh J. Issis (ASB-4785-S83P)
SOUTHERN MED LAW
2224 1st Ave North
Birmingham, AL 35203
D: 205.547.5525
F: 205.547.5526
francois@southernmedlaw.com
evan@southernmedlaw.com
odeh@southernmedlaw.com

*Attorneys for the Plaintiff*

# I.   Table of Contents

I.     Table of Contents ........................................................ 2

II.    Introduction ............................................................... 3

III.   Parties, Jurisdiction, and Venue ................................. 3

IV.    Allegations ................................................................ 6

V.     Counts ..................................................................... 14

      Count One (AEMLD) Product Liability – Design Defect ............ 14

      Count Two (AEMLD) Product Liability – Failure to Warn ........ 17

      Count Three – Negligence/Negligent Design, Manufacture & Sale
      ............................................................................... 21

      Count Four – Negligent Failure to Warn ...................................... 23

      Count Five – Misrepresentation ...................................... 26

      Count Six – Breach of Implied Warranty of Merchantability ....... 34

      Count Seven – Breach of Implied Warranty of Fitness ............... 36

VI.    Prayer for Relief ........................................................ 37

## II.   Introduction

1.      Plaintiff Conrad De Los Santos asserts personal-injury claims centering on the recalled aerosol sunscreen designed, marketed, promoted, manufactured, distributed, and sold by Johnson & Johnson through one or more of its subsidiaries.

2.      This Complaint states causes of action under theories of negligence, breach of warranty, misrepresentation, and the Alabama Extended Manufacturer's Liability Doctrine (AEMLD).

3.      This action centers on the design, marketing, manufacture, postmarketing surveillance, sale, advertising, promotion, warning, distribution, and recall of aerosol sunscreen product lines under the NEUTROGENA® brand, which are made and sold by Johnson & Johnson through its subsidiary Johnson & Johnson Consumer Inc.

## III.   Parties, Jurisdiction, and Venue

4.      Plaintiff Conrad De Los Santos is an adult citizen and resident of Jefferson County, Alabama. His domicile is Jefferson County, AL.

5.      Johnson & Johnson is a foreign corporation organized and existing under the laws of New Jersey. J&J has its worldwide

headquarters, principal place of business, and corporate nerve center, located at One Johnson & Johnson Plaza, New Brunswick, New Jersey

6.     Johnson & Johnson organizes its subsidiary businesses into individual business units to coordinate the development, manufacture, testing, marketing, promotion, training, distribution, and sale of its products. Within J&J there are three sectors, medical devices & diagnostics, pharmaceutical, and consumer.

7.     Defendant Johnson & Johnson Consumer Inc., ("J&J Consumer") is a New Jersey corporation with its headquarters and principal place of business at Grandview Road, Skillman, New Jersey, 08558. Johnson & Johnson Consumer Inc. manufactures, markets, advertises, labels, distributes, and sells the sunscreen products at issue in this litigation.

8.     Johnson & Johnson and Johnson & Johnson Consumer Inc., are collectively referred to as "J&J" or "Defendants."

9.     At all times relevant herein, J&J was engaged in the business of placing the recalled sunscreen products into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and selling such products.

10.    Upon information and belief, Johnson & Johnson Consumer Inc., is an alter ego that acts under the direction and control of the officers and directors of the J&J conglomerate, Johnson & Johnson. Johnson & Johnson is liable for the actions and inactions effectuated under the mask of Johnson & Johnson Consumer Inc.

11.    Johnson & Johnson and Johnson & Johnson Consumer Inc., at all times relevant operated as mere alter egos or instrumentalities of each other. There is such a unity of interest and ownership between them that the separate corporate personhoods ceased to exist. Defendants operate on paper as multiple companies but pragmatically as a single enterprise, controlled by the officers and directors of Johnson & Johnson. Defendants commingled their assets and funds, disregarded corporate formalities, and used each other as a corporate shield to defeat justice, perpetuate fraud and evade or diminish contractual and tort liability. Defendants acted in all respects as agents or apparent agents of one another.

12.    There is complete diversity of citizenship here between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00. Subject-matter jurisdiction therefore exists under 28 U.S.C. § 1332.

13.     Defendants have significant minimal contacts with this judicial district, having done substantial business in this district and purposefully availed themselves of the benefits and protections of the laws of this district. Defendants regularly transacted business in Alabama that includes marketing and selling these recalled products at the consumer level. They derive substantial revenue from their business transactions in Alabama and have purposely availed themselves of the privilege of doing business in Alabama. Defendants are therefore subject to specific personal jurisdiction in Alabama and this judicial district.

14.     Plaintiff Conrad De Los Santos has purchased recalled products in Jefferson County, Alabama. Venue is proper under 28 U.S.C. § 1391(a) in that a substantial part of the events giving rise to the causes of action occurred in this judicial district.

## IV.   Allegations

15.     On July 14, 2021, Johnson & Johnson Consumer Inc., voluntarily recalled all lots of five NEUTROGENA® and AVEENO® aerosol sunscreen product lines to the consumer level. **Exhibit A.** All the aerosol sunscreen products subject to the recall are referred to herein as "recalled products."

16.     J&J recalled the products in response to a citizen petition issued to the FDA on May 24, 2021, by Valisure LLC. **Exhibit B**. Valisure is an analytical pharmacy dedicated to consumer safety and based in New Haven, Connecticut.

17.     Valisure "tested and detected high levels of benzene, a known human carcinogen, in several brands and batches of sunscreen [made by Johnson & Johnson]." **Exhibit C.** Valisure then petitioned the FDA, asking for a recall of the sunscreen and requesting that the FDA "better define limits for benzene contamination in drug and cosmetic products." *Id.*

18.     After the Valisure petition, Johnson & Johnson internally tested the aerosol and then through Johnson & Johnson Consumer Inc., issued a voluntary recall of specific NEUTROGENA® and AVEENO® aerosol sunscreen product lines. **Exhibit A.**

19.     Johnson & Johnson admits that through the testing it performed J&J detected the presence of benzene in the recalled products. *Id.*

20.     J&J claims that benzene is not an ingredient in any of its sunscreen products, and that J&J does not understand how benzene is present in its aerosol sunscreen. *Id.*

21.    J&J claims to be "investigating the cause of this issue." *Id.*

22.    Plaintiff Conrad De Los Santos asserts claims for personal injuries relating to the dangers of the recalled NEUTROGENA® products, including the Beach Defense® and Ultra Sheer® aerosol sunscreen product lines. Conrad used multiple recalled NEUTROGENA® products without having first been warned about the presence of high levels of benzene.

23.    Conrad has been a user of NEUTROGENA® aerosol sunscreen for about the last ten years, always keeping a can of it in his car. Before July 2020, Conrad used NEUTROGENA® aerosol sunscreen several times a week and up to once daily.

24.    In or around July 2020, Conrad was diagnosed with lupus and Chron's disease. Because of these diagnoses, his rheumatologist recommended that he use sunscreen regularly. Conrad thereupon began to increase his usage of NEUTROGENA® aerosol sunscreen—up to three times daily.

25.    After increasing his usage of NEUTROGENA® products, Conrad, among other things, had abnormal clinical findings, including abnormal labs and bloodwork, requiring a full workup with hematology and oncology, including a bone-marrow aspirate. The abnormal labs,

bloodwork, and blood smears show findings consistent with benzene exposure. Conrad also developed cardiac problems, including atrial fibrillation. He is at substantial increased risk to develop leukemia or cancers of the blood. Conrad therefore must be medically monitored to promote early diagnosis and early treatment of those serious diseases for which he is now at increased risk. Because of the negative health consequences caused by his benzene exposure, moreover, Conrad has been forced to make substantial lifestyle changes, including abstinence from alcohol, caffeine, and sugar.

26.    Benzene, a human carcinogen, is known to cause the kind of negative health problems that Conrad has experienced, including autoimmune disorders, diseases of the blood, and cardiac problems. Conrad has unfortunately been experiencing these problems without having first known about his benzene exposure. Because the presence of benzene was not disclosed to him, Conrad was unable to reasonably limit his exposure to this dangerous chemical.

27.    The dangers disclosed by Johnson & Johnson in the July 14th recall were not known, available, or knowable to Conrad before that time. This lawsuit is therefore timely and brought within the

prescribed limitations period based upon the legal principles of accrual, discovery, and tolling.

28.     Defendants owed a duty not to cause Plaintiff an unreasonable risk of injury due to a defect or lack of safety or efficacy with the recalled aerosol sunscreen products. This includes a duty to conduct adequate and well controlled testing before marketing and during postmarketing surveillance.

29.     But Defendants provided consumers with false and misleading information about product safety and efficacy even though they knew or should have known about the dangers disclosed in the recall before July 14, 2021.

30.     Defendants also chose to market and sell the defective products in a way to maximize the sales but minimize health and safety, failing to conduct adequate testing or failing to appropriately inform consumers about the presence of benzene before the Valisure testing.

31.     Defendants have not disclosed when they first learned about the presence of benzene in the recalled products.

32.     Defendants wrongfully withheld from the information sphere the true risk and benefits of their aerosol sunscreen products, encouraging use to protect against melanoma while failing to warn

about the presence of benzene. Because of this negative propaganda campaign, Defendants helped convince consumers to use the products to help protect against cancer yet failed to also warn that the products contain high levels of benzene.

33.     Because Defendants wrongfully withheld the true information about these dangers, there has been pervasive use of defective products when other safer alternatives are available.

34.     Defendants negligently, willfully, wantonly, and/or recklessly failed to warn about the true risks, dangers, defects, and disadvantages of the recalled products. Defendants instead suppressed the true risks and benefits, including the presence of harmful chemicals in the product.

35.     Defendants knew or should have known that the recalled products are not safe for the intended and ordinary purpose for which they are sold. These recalled products are likely to cause and do cause serious injury and death.

36.     Plaintiff makes no claim here for fraud on the FDA. Rather, Plaintiff's claims center on the Defendants' failure to warn about the dangers they knew or should have known. These defendants knew or should have known about these dangers through appropriate

review, testing, and postmarketing surveillance. There is a presumption against federal preemption of state laws that operate in traditional state domains. It is black-letter law that manufacturers must warn of dangers that they knows or should know exist with ordinary use of their products, and this duty continues after sale. State law claims may therefore parallel federal-law duties existing under the FDA regulations. See, e.g., *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769-70 (5th Cir. 2011).

37.    Defendants have underreported and misreported adverse-event information about the propensity of the recalled products to cause serious injury, complications, and death. They have misrepresented the efficacy and safety of recalled products generally, downplaying the risks and overstating the benefits through various means and media, actively and intentionally misleading the FDA and the public at large.

38.    At all times relevant hereto, Plaintiff was exposed to and regularly used the recalled products in an intended or reasonably foreseeable manner. Plaintiff used the recalled products without knowing about the unreasonably dangerous characteristics. Had the unreasonably dangerous features of the product been made known,

Plaintiff would never have used the products. He would instead have used other safer alternatives in existence and available on the market.

39.    The harm caused by the recalled products far outweigh the benefits, rendering the product unreasonably dangerous to an extent beyond that which an ordinary consumer would consent.

40.    Withholding knowledge about the true dangers while persisting with the defective marketing message is a manufacturing of consent. Plaintiff never would have consented to using the recalled defective products had the true dangers, risks, and benefits first been made known.

41.    The recalled products are more dangerous than available alternative products. Defendants could have designed and tested the recalled products to make them less dangerous—without benzene. A less risky design or formulation was attainable at the time of manufacture and sale.

42.    At the time the recalled products, including the subject products, left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended utility.

43.    Defendants' defective design was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the recalled products.

44.    Because of the unreasonably dangerous condition of their recalled products, Defendants are liable for negligence, breach of warranty, and for product claims under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD).

## V.    Counts

### Count One (AEMLD) Product Liability – Design Defect

45.    Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

46.    The recalled products are defectively designed in that they are unreasonably dangerous and do not meet the reasonable expectations of the ordinary consumer or user as to safety. The warnings, moreover, do not adequately cover the defects made known by the voluntary recall (July 14, 2021), including:

    i.   The recalled products are defective in design and formulation;

    ii.   The dangers are beyond that which an ordinary consumer would contemplate;

    iii.   The recalled products are unreasonably dangerous given the presence of benzene, a volatile organic

compound (VOC) that causes cancer and other serious illnesses;

iv.   The products are unreasonably dangerous when used in a reasonably anticipated manner;

v.   Defendants did not timely disclose the results of earlier tests or studies of the recalled products showing the presence of benzene or VOCs.

vi.   Using the recalled products presents a risk of serious injury that outweighs any potential utility of the products;

vii.   Defendants knew or should have known at the time of marketing and continued marketing and selling the recalled products, including the subject products, that ordinary use could result in cancer and other severe illnesses and injuries;

viii. Instead of timely disclosing the dangers—the risks of cancer—Defendants continued to market, sell, and promote the recalled products until Valisure petitioned the FDA;

ix.   The lack of adequate postmarketing surveillance; and

x.   The existence of safer alternative designs and formulations making them less prone to causing cancer and other adverse health conditions.

47.   The recalled products were defective in design when they left the possession of Defendants' control. There was no substantial change from the time they left the possession of Defendants until they reached Plaintiff.

48.     There was a safer and more practical alternative design that Defendants could have used at the time that they made and sold the recalled products.

49.     Plaintiff was caused substantial harm and suffered both economic and noneconomic damages by the design defects in the recalled products, including loss of enjoyment of life.

50.     The recalled products are unreasonably dangerous and defective, unfit, and unsafe for intended use and reasonably foreseeable uses and do not meet or perform to the expectations of the ordinary consumer.

51.     The recalled products are defective in design because they fail to perform as safely as persons who ordinarily use the products would expect at time of use.

52.     Plaintiff used the recalled products in a manner that was reasonably foreseeable to the Defendants.

53.     Plaintiff could not have by the exercise of reasonable care discovered the defective conditions or perceived the unreasonable dangers and unreasonably dangerous propensities before July 14, 2021.

54.     As a result of the foregoing design defects, the recalled products create risks to the health and safety of its users that are far more significant and devastating than the risks posed by other products available, and which far outweigh the utility of the recalled products.

55.     Defendants have intentionally and recklessly designed the recalled products with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

56.     As a proximate result of the Defendants' design, Plaintiff has been injured seriously and has sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

**Count Two (AEMLD) Product Liability – Failure to Warn**

57.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

58.     The recalled products are dangerous when used as intended. Defendant failed to give adequate warnings about the dangers and propensities of the products to cause unreasonable harm when used as intended.

59.    The products were used as intended. Defendants either knew or should have known, through postmarketing surveillance and otherwise, that the product could create the kinds of dangers complained about when used as intended and in its ordinary and customary manner.

60.    No timely adequate warning was made about the kinds of dangers described here.

61.    Plaintiff was caused substantial harm and suffered both economic and noneconomic damages because of the failure to warn about the danger.

62.    At the time the Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the recalled products, they knew or should have known that the products present an unreasonable danger when put to intended and/or reasonably anticipated use.

63.    Defendants knew or should have known, and therefore should have warned about the following dangers:

> i.  The recalled products are defective in design and formulation;
>
> ii. The dangers are beyond that which an ordinary

consumer would contemplate;

iii. The recalled products are unreasonably dangerous given the presence of benzene, a volatile organic compound (VOC) that causes cancer and other serious illnesses;

iv. The products are unreasonably dangerous when used in a reasonably anticipated manner;

v. Defendants did not timely disclose the results of earlier tests or studies of the recalled products showing the presence of benzene or VOCs.

vi. Using the recalled products presents a risk of serious injury that outweighs any potential utility of the products;

vii. Defendants knew or should have known at the time of marketing and continued marketing and selling the recalled products, including the subject products, that ordinary use could result in cancer and other severe illnesses and injuries;

viii. Instead of timely disclosing the dangers—the risks of cancer—Defendants continued to market, sell, and promote the recalled products until Valisure petitioned the FDA;

ix. The lack of adequate postmarketing surveillance; and

x. The existence of safer alternative designs and formulations making them less prone to causing cancer and other adverse health conditions.

64.     Defendants failed to warn about the level of research and testing of the recalled products, including the true results of the available testing, and known information from complaints and adverse events.

65.     The risks associated with the recalled products are of such a nature that consumers could not have recognized the potential harm without the information disclosed via the recall.

66.     The recalled products were defective and unreasonably dangerous at the time of release into the stream of commerce due to the inadequate warnings, labeling and/or instructions accompanying the product.

67.     When used by Plaintiff, the recalled products were in the same condition as at the time of manufacture, inspection, marketing, labeling, promoting, distributing and sale.

68.     Defendants    willfully,    intentionally,    recklessly, deliberately, negligently, and/or and maliciously misrepresented the safety, risks, and benefits to advance their own financial interests, with wanton and willful disregard for the rights and health of the Plaintiff.

69.    As a proximate result of the Defendants' failure to warn, Plaintiff has been injured seriously and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of health, comfort, and economic damages.

**Count Three – Negligence/Negligent Design, Manufacture & Sale**

70.    Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

71.    Defendants negligently designed, manufactured, supplied, distributed, and sold the recalled products.

72.    Plaintiff was caused substantial harm and suffered both economic and noneconomic damages because of the negligent, design, manufacture, and sale.

73.    The negligence was a proximate cause of Plaintiff's harm and damages.

74.    Defendants had a duty to exercise reasonable and ordinary care in the manufacture, design, labeling, instruction, warning, sale, marketing, safety surveillance and distribution of the recalled products to avoid exposing Plaintiff to foreseeable and unreasonable risks of harm.

75.     Defendants breached their duty of care to Plaintiff, in the manufacture, design, labeling, warning, instructions, sale, marketing, safety surveillance, and distribution of the recalled products.

76.     Defendants knew or should have known that the recalled products were unreasonably dangerous when used ordinarily and as intended.

77.     Defendants knew or should have known that the recalled products when used as they marketed and sold are unreasonably dangerous and have the defects described herein.

78.     Defendants knew or reasonably should have known that the recalled products are more dangerous or likely to be dangerous when as intended or in a reasonably foreseeable manner. Defendants had a duty to avoid causing an unreasonable risk of harm to Plaintiff.

79.     At the time of manufacture and sale, Defendants knew or should have known that using the recalled products for intended use or in a reasonably foreseeable manner created a significant risk of a patient suffering and severe injuries, including cancer, autoimmune disorders, and cardiac injury.

80.     Defendants breached their duty to exercise reasonable and prudent care in the development, testing, manufacture, inspection, marketing, labeling, promotion, distribution, and sale of the recalled products.

81.     A reasonable manufacturer, distributor, and/or seller under the same or similar circumstances would not have engaged in the acts and omissions complained about herein.

82.     As a proximate result of the Defendants' design, manufacture, marketing, sale, and/or distribution of the recalled products, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of health, comfort, and economic damages.

**Count Four – Negligent Failure to Warn**

83.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

84.     The recalled products are dangerous when used as intended. Defendants failed to give adequate warnings about the dangers and propensities of the product to cause unreasonable harm when used as intended.

85.    The products were used as intended. Defendants either knew or should have known, through postmarketing surveillance and otherwise, that the recalled products could create the kind of dangers described here when used as intended and in its ordinary and customary manner.

86.    No timely adequate warning was made about the kind of danger described here.

87.    Plaintiff was caused substantial harm and suffered both economic and noneconomic damages because of the failure to warn about these dangers.

88.    At the time the Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the recalled products, they knew or should have known that the products present an unreasonable danger to patients when put to intended or reasonably anticipated use.

89.    Defendants owed a duty to avoid causing Plaintiff an unreasonable risk of injury by providing adequate warnings.

90.    Defendants failed to warn about the level of research and testing of the recalled products properly and adequately, and failed to so warn about the propensities of the product to cause cancer and other serious injuries and health problems.

91.    As a proximate result of the Defendants' negligent failure to warn, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, and impairment, loss of health, comfort, and economic damages.

**Count Five – Misrepresentation**

92.    Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

93.    Defendants falsely and fraudulently represented to the public that the recalled products had been tested and were safe and effective.

94.    The representations made by Defendants were, in fact, false. When Defendants made their representations, Defendants knew and/or had reason to know that those representations were indeed false. Yet Defendants negligently, willfully, wantonly, and recklessly disregarded the inaccuracies in their representations about the dangers of the recalled products.

95.    These representations were made by Defendants with the intent of defrauding and deceiving the public, and also inducing consumers at large to purchase the recalled products for use, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers including Plaintiff.

96.    In representations to Plaintiff and the public, Defendants fraudulently concealed and intentionally or recklessly omitted the following material information:

i.     That the recalled products are not as safe as other similar products available;

ii.    That the recalled products are not more effective than other similar products available;

iii.   That the likelihood of an adverse event requiring serious medical attention with the recalled products is much higher than with other similar products available;

iv.    That the testing and surveillance shows the recalled products have a higher risk of adverse effects beyond those associated with other similar products available;

v.     That Defendants deliberately failed to follow up on the adverse results from studies and formal and informal reports and buried and/or misrepresented those findings;

vi.    That Defendants deliberately chose to forego studies that might reveal the true levels of benzene present and rate of adverse events or otherwise necessitate the need to reveal information as to adverse events to the Plaintiff or the regulatory authorities;

vii.   That Defendants were aware of dangers beyond those associated with other similar products available;

viii.  That the recalled products are defective, and that they cause dangerous and adverse health consequences, including cancer;

ix.    That users of the recalled products need to be medically monitored; and

x.     That the recalled products contain benzene, which is harmful to humans, and causes cancer, serious injury, and death;

97.    Defendants were under a duty to disclose the defective nature of the recalled products, including but not limited to the heightened risks of cancer, injury, and death.

98.    Defendants had access to the full material facts concerning the defective nature of the recalled products and the propensity to cause serious injury and death.

99.    Defendants' concealment and omissions of material fact were done negligently, purposefully, willfully, wantonly, and/or recklessly to mislead, to cause Plaintiff and consumers to purchase the recalled products; and/or to mislead Plaintiff and consumers into reliance and cause Plaintiff to use the recalled products.

100.   At the time these representations were made, and at the time Plaintiff used the recalled products, Plaintiff was unaware of the falsehood of these representations, and reasonably believed them to be true.

101.   Defendants knew and had reason to know that the recalled products could and would cause serious injury, and that the products are inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

102.   In reliance upon these false representations, Plaintiff

was induced to and did use the recalled products in a pervasive manner. Plaintiff thereby sustained severe and permanent personal injuries and damages.

103.   Defendants knew or had reason to know that Plaintiff and consumers had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of the recalled products, as described in detail herein.

104.   Plaintiff reasonably relied on revealed facts which foreseeably and purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the recalled products.

105.   Having knowledge based upon Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring Plaintiff, the public, and consumers at large, that the recalled products are safe for use and as safe or safer than other products available on the market.

106.   As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed, and suppressed

certain results of testing and research to Plaintiff and the public at large.

107.   Defendants had a duty when disseminating information to the public to disseminate truthful information; and a parallel duty not to deceive the public, Plaintiff, and the United States Food and Drug Administration.

108.   The information distributed to the public, the FDA, and Plaintiff by Defendants included, but was not limited to websites, information presented at point of sale and in marketing, information disseminated by company representatives, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the recalled products.

109.   Defendants         intentionally         made         material misrepresentations to the public, including Plaintiff, regarding the safety of the recalled products specifically that they did not have dangerous and/or serious adverse health safety concerns, and that the recalled products were safe or safer than other similar products

available.

110. Defendants intentionally failed to purchasers and the public, including Plaintiff, of the dangers and risk of injury.

111. Defendants chose to falsely market the purported safety, efficacy, and benefits of the recalled products instead.

112. Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and Plaintiff; to gain the confidence of the public and Plaintiff; to falsely assure them of the quality and fitness for use of the recalled products; and induce Plaintiff and the public to purchase and continue to use the recalled products.

113. Defendants made claims and representations in its documents submitted to the FDA and its reports to the public and in advertisements that the recalled products have beneficial properties and do not present serious health risks.

114. These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist and were made recklessly and without regard to the true facts.

115.   These representations, and others made by Defendants, were made with the intention of deceiving and defrauding Plaintiff and the public, and were made in order to induce Plaintiff to rely on misrepresentations, and caused Plaintiff to purchase, rely, use, and request the recalled products.

116.   Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the recalled products to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and/or not as safe as other alternatives.

117.   Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations, for the purpose of deceiving and lulling Plaintiff and consumers into a false sense of security, so that Plaintiff and consumers would rely on Defendants' representations, and Plaintiff and others would request and purchase the recalled products.

118.   At the time the representations were made, Plaintiff did not know the truth about the dangers and serious health and safety risks inherent in the use of the recalled products. Plaintiff did not discover the true facts about the dangers and serious health and/or

safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendant's misrepresentations.

119.   Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the recalled products, Plaintiff would not have purchased or used, or relied on the recalled products.

120. Defendants' wrongful conduct constitutes fraud, suppression, concealment, and deceit, and was committed and perpetrated willfully, wantonly, and/or purposefully on Plaintiff.

121.   As a direct and proximate result of Defendants' conduct, Plaintiff experienced significant mental and physical pain and suffering, have sustained permanent injury, have undergone medical treatment and will likely undergo future medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, other damages, including loss of enjoyment of life.

122. WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages, punitive damages, together with interest, costs of suit, and such further relief as the Court deems

equitable and just.

**Count Six – Breach of Implied Warranty of Merchantability**

123.   Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

124.   Defendants were regularly in the business of selling the recalled products at all times relevant.

125.   The recalled products are not suitable or fit for the ordinary purpose for which they are used.

126.   Plaintiff was caused substantial harm and suffered both economic and noneconomic damages as a result of this breach of warranty.

127.   At relevant times, the Defendants intended that the recalled products be used for the purposes and in the manner Plaintiff used it and the Defendants impliedly warranted that the recalled products are of merchantable quality, safe and fit for such use, and are adequately tested.

128.   Defendants were aware that consumers, including Plaintiff would use the recalled products in the manner that was foreseeable.

129.   Plaintiff was at all relevant times in privity with the Defendants.

130.   The recalled products were expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which they manufactured and sold.

131.   The Defendants breached various implied warranties with respect to the recalled products, including the following particulars:

 i. Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the recalled products are safe and fraudulently withheld and concealed information about the substantial risks of serious injury associated with use.

 ii. Defendants represented that the products are safe or safer than other alternative products and fraudulently concealed information, which demonstrated it was not as safe or safer than alternatives available on the market;

 iii. The Defendants represented that the recalled products were as efficacious than other alternative treatments and fraudulently concealed information about the true efficacy; and

 iv. In reliance upon the implied warranties, Plaintiff used the recalled products as prescribed in the foreseeable manner normally intended, recommended, promoted, and marketed by the Defendants.

132.   Defendants breached their implied warranties to Plaintiff in that the recalled products are not of merchantable quality, safe and/or fit for intended use, or adequately tested, in violation of common law principles.

133.   As a proximate result of the breaches of warranty, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, comfort, and economic damages.

**Count Seven – Breach of Implied Warranty of Fitness**

134.   Plaintiff realleges and incorporates by reference every allegation of this Complaint as though fully set forth herein.

135.   Defendants were regularly in the business of selling the recalled products at all times relevant.

136.   Defendants knew that the purchasers, consumers, and Plaintiff were relying on their skill or judgment to provide a suitable product.

137.   The recalled products are not suitable or fit for the particular purpose for which they are used.

138.   Plaintiff was caused substantial harm and suffered both economic and noneconomic damages because of this breach of warranty.

## VI.    Prayer for Relief

WHEREFORE, Plaintiff requests the following relief:

i.    That process issue and the Defendants be served in accordance with the Federal Rules of Civil Procedure;

ii.    That Plaintiff be awarded compensatory damages, including medical expenses, subrogation expenses, lost wages, loss of earning capacity, loss of enjoyment of life, future economic damages, general noneconomic damages, pain and suffering, and for personal injury in an amount to be determined by the enlightened conscience of a jury;

iii.    That Plaintiff be allowed to amend this Complaint in accordance with the Federal Rules of Civil Procedure;

iv.    That the Plaintiff be awarded punitive damages;

v.    That Plaintiff have a trial by jury as to all issues; and

vi.    That Plaintiff be awarded such other relief as this Court may deem just and proper.


Submitted: September 3, 2021


_Evan Rosemore_
François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
Odeh J. Issis (ASB-4785-S83P)
SOUTHERN MED LAW
2224 1st Ave North
Birmingham, AL 35203
D: 205.547.5525
F: 205.547.5526
francois@southernmedlaw.com
evan@southernmedlaw.com
odeh@southernmedlaw.com

37

FILED

2021 Sep-03  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

**COMPANY ANNOUNCEMENT**

# Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene

When a company announces a recall, market withdrawal, or safety alert, the FDA posts the company's announcement as a public service. FDA does not endorse either the product or the company.

Read Announcement

## Summary

**Company Announcement Date:**

July 14, 2021

**FDA Publish Date:**

July 14, 2021

**Product Type:**

Drugs

**Reason for Announcement:**

Testing identified low levels of benzene

**Company Name:**

Johnson & Johnson

**Brand Name:**

Neutrogena, Aveeno

**Product Description:**

Sunscreen

## Company Announcement

Johnson & Johnson Consumer Inc. (JJCI) is voluntarily recalling all lots of five NEUTROGENA® and AVEENO® aerosol sunscreen product lines to the consumer level. Internal testing identified low levels of benzene in some samples of the products. Consumers should stop using the affected products and follow the instructions set forth below.

The only sunscreen products impacted are aerosol products, specifically:

- NEUTROGENA® Beach Defense® aerosol sunscreen,

- NEUTROGENA® Cool Dry Sport aerosol sunscreen,

- NEUTROGENA® Invisible Daily™ defense aerosol sunscreen,

- NEUTROGENA® Ultra Sheer® aerosol sunscreen, and

- AVEENO® Protect + Refresh aerosol sunscreen.

Product images and lot information is available on www.Neutrogena.com (http://www.neutrogena.com/) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) and www.Aveeno.com (http://www.aveeno.com/) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer).

Benzene is classified as a human carcinogen, a substance that could potentially cause cancer depending on the level and extent of exposure. Benzene is ubiquitous in the environment. Humans around the world have daily exposures indoors and outdoors from multiple sources. Benzene can be absorbed, to varying degrees, by inhalation, through the skin, and orally. Based on exposure modeling and the Environmental Protection Agency's (EPA) framework, daily exposure to benzene in these aerosol sunscreen products at the levels detected in our testing would not be expected to cause adverse health consequences. Out of an abundance of caution, we are recalling all lots of these specific aerosol sunscreen products.

While benzene is not an ingredient in any of our sunscreen products, it was detected in some samples of the impacted aerosol sunscreen finished products. We are investigating the cause of this issue, which is limited to certain aerosol sunscreen products.

Sunscreen use is critical to public health. Melanoma incidences continue to increase worldwide, and the majority of cases are caused by excessive sun exposure. It is important that people everywhere continue to take appropriate sun protection measures, including the continued use of alternative sunscreen.

The recalled sunscreen products are packaged in aerosol cans. The products were distributed nationwide through a variety of retail channels.

Consumers should stop using these specific products and appropriately discard them. Consumers may contact the JJCI Consumer Care Center 24/7 with questions or to request a refund by calling 1-800-458-1673. Consumers should contact their physician or healthcare provider if they have any questions, concerns or have experienced any problems related to using these aerosol sunscreen products. JJCI is also notifying its distributors and retailers by letter and is arranging for returns of all recalled products.

Adverse reactions or quality problems experienced with the use of this product may be reported to the FDA's MedWatch Adverse Event Reporting program either online, by regular mail or by fax.

- Complete and submit the report Online (/safety/medwatch-fda-safety-information-and-adverse-event-reporting-program/reporting-serious-problems-fda)

- Regular Mail or Fax: Download form (/safety/medical-product-safety-information/medwatch-forms-fda-safety-reporting) or call 1- 800-332-1088 to request a reporting form, then complete and return to the address on the pre-addressed form, or submit by fax to 1-800-FDA-0178

This recall is being conducted with the knowledge of the U.S. Food and Drug Administration.

### *Cautions Concerning Forward-Looking Statements*

This press release contains "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995 regarding the voluntary recall of specific NEUTROGENA® and AVEENO® aerosol sunscreen products. The reader is cautioned not to rely on these forward-looking statements. These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or known or unknown risks or uncertainties materialize, actual results could vary materially from the expectations and projections of Johnson & Johnson Consumer Inc. and/or Johnson & Johnson. Risks and uncertainties include, but are not limited to: product efficacy or safety concerns resulting in product recalls or regulatory action; significant adverse litigation or government action, including related to product liability claims; uncertainty of commercial success for new and existing products; the ability of the company to successfully execute strategic plans; manufacturing difficulties or delays, internally or within the supply chain; changes to applicable laws and regulations; changes in behavior and spending patterns of purchasers of health care products and services; and increased scrutiny of the health care industry by government agencies. A further list and descriptions of these risks, uncertainties and other factors can be found in Johnson & Johnson's Annual Report on Form 10-K for the fiscal year ended January 3, 2021, including in the sections captioned "Cautionary Note Regarding Forward-Looking Statements" and "Item 1A. Risk Factors," and in the company's most recently filed Quarterly Report on Form 10-Q, and the company's subsequent filings with the Securities and Exchange Commission. Copies of these filings are available online at www.sec.gov (http://www.sec.gov/), www.jnj.com (http://www.jnj.com/) ⧉ (http://www.fda.gov/about-fda/website-policies/website-disclaimer) or on request from Johnson & Johnson. Neither Johnson & Johnson Consumer Inc. nor Johnson & Johnson undertakes to update any forward-looking statement as a result of new information or future events or developments. The Company expressly disclaims all liability in respect to actions taken or not taken based on any or all the contents of this press release.

# Company Contact Information

**Consumers:**

JJCI Consumer Care Center

📞 1-800-458-1673

**Media:**

Jake Sargent

📞 (732)-524-1090

✉ jsargen3@its.jnj.com (mailto:jsargen3@its.jnj.com)

◄ More Recalls, Market
Withdrawals, &
Safety Alerts (/safety/recalls-market-withdrawals-safety-alerts)

FILED
2021 Sep-03  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit B



May 24, 2021

Division of Dockets Management
Food and Drug Administration
5630 Fishers Lane, Room 1061
Rockville, MD  20852

Re:  Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products

Dear Sir or Madam:

The undersigned, on behalf of Valisure LLC ("Valisure" or "Petitioner"), submits this Citizen
Petition ("Petition") pursuant to Sections 301(21 U.S.C. § 331), 501 (21 U.S.C. § 351), 502 (21
U.S.C. § 352), 505 (21 U.S.C. § 355), 601 (21 U.S.C. § 361), 602 (21 U.S.C. § 362), 702 (21
U.S.C. § 372), 704 (21 U.S.C. § 374), and  705 (21 U.S.C. § 375) of the Federal Food, Drug and
Cosmetic Act (the "FDCA"), in accordance with 21 C.F.R. 10.20 and 10.30, to request the
Commissioner of Food and Drugs ("Commissioner") to issue a regulation, request recalls, revise
industry guidance, and take such other actions set forth below.

## A.  Action Requested

Sunscreens are considered drugs that are regulated by the U.S. Food and Drug Administration
("FDA").[1] Valisure has tested and detected high levels of benzene in specific batches of
sunscreen products containing active pharmaceutical ingredients including avobenzone,
oxybenzone, octisalate, octinoxate, homosalate, octocylene and zinc oxide. The Centers for
Disease Control and Prevention ("CDC") states that the Department of Health and Human
Services has determined that benzene causes cancer in humans.[2] The World Health Organization
("WHO") and the International Agency for Research on Cancer ("IARC") have classified
benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[3]  FDA
currently recognizes the high danger of this compound and lists it as a "Class 1 solvent" that
"should not be employed in the manufacture of drug substances, excipients, and drug products
because of their unacceptable toxicity ... However, if their use is unavoidable in order to produce
a drug product with a significant therapeutic advance, then their levels should be restricted" and
benzene is restricted under such guidance to 2 parts per million ("ppm").[4]  Because many of the
sunscreen products Valisure tested did not contain detectable levels of benzene, it does not
appear that benzene use is unavoidable for their manufacture, and considering the long history
and widespread use of these products, it also does not appear that they currently constitute a

---

[1] Certain sunscreens may also be dually regulated as cosmetics under the FDCA, and the designations "drug" and
"cosmetic" are not mutually exclusive.

[2] Centers for Disease Control and Prevention, *Facts About Benzene* (2018)
(https://emergency.cdc.gov/agent/benzene/basics/facts.asp)

[3] International Agency for Research on Cancer and World Health Organization, *IARC Monographs on the
Identification of Carcinogenic Hazards to Humans* (https://monographs.iarc.who.int/list-of-classifications)

[4] Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017)
(https://www.fda.gov/media/71737/download)



significant therapeutic advance; therefore, any significant detection of benzene should be deemed unacceptable. The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[5, 6] Valisure found multiple sunscreen products that contain levels of benzene that significantly surpass the 2 ppm conditional FDA restriction. Furthermore, benzene is associated with certain blood cancers such as leukemia,[7] and recent studies by FDA researchers have shown that significant amounts of sunscreen ingredients absorb through the skin and are found in the blood; specifically, over 400 times the threshold for systemic carcinogenicity assessment for at least one sunscreen active ingredient.[8, 9]

The presence of this known human carcinogen in sunscreen products widely recommended for the prevention of skin cancer and regularly used by adults and children in large volumes makes this finding especially troubling.

Additionally, Valisure found multiple after-sun care products that contain benzene and some products with benzene contamination above 2 ppm. After-sun care products, which may also be labeled as "after-burn care" or other "skin care" references, are typically regulated by FDA as cosmetics under the FDCA and the Fair Packaging and Labeling Act ("FLPA") and may contain aloe and other ingredients that are marketed for topical use after exposure to the sun and are often sold in close proximity to sunscreen products.[10]

This Petition requests that the Commissioner take the following actions:

1) request a recall of identified batches of sunscreen products on the basis that, due to contamination with a known human carcinogen, these products are adulterated under Section 501 of the FDCA (21 U.S.C. § 351) and misbranded under Section 502 of the FDCA (21 U.S.C. § 352);

2) conduct examinations and investigation under Section 702 (a) of the FDCA (21 U.S.C. § 372(a)) regarding these products, their manufacturing processes, and the manufacturer

---

[5] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (October 30, 2019) (https://www.cdc.gov/niosh/npg/npgd0049.html)

[6] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health, BENZENE: Systemic Agent* (2011) (https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750032.html)

[7] American Cancer Society. *Benzene and Cancer Risk* (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[8] Matta, MK; et. al. (2019). Effect of Sunscreen Application Under Maximal Use Conditions on Plasma Concentration of Sunscreen Active Ingredients A Randomized Clinical Trial. *Journal of the American Medical Association*. 2019;321(21):2082-2091 (https://jamanetwork.com/journals/jama/fullarticle/2733085)

[9] Matta, MK; et. al. (2020). Effect of Sunscreen Application on Plasma Concentration of Sunscreen Active Ingredients A Randomized Clinical Trial. *Journal of the American Medical Association*. 2020;323(3):256-267 (https://jamanetwork.com/journals/jama/fullarticle/2759002)

[10] Depending on the claims in the labeling, certain after-sun products may also be regulated as drugs under the FDCA.



submissions made for FDA approval under 704 (a) of the FDCA (21 U.S.C. § 374(a)), and effect labeling revisions as needed;

3) provide information to the public regarding these products under Section 705(b) of the FDCA (21 U.S.C. § 375(b)), in particular, that safe sunscreen alternatives to contaminated products are available and that the use of unadulterated sunscreen is an important protection against cancers caused by exposure to harmful solar radiation;

4) consider promulgating rules or administrative orders, revising and reissuing, as necessary and appropriate, FDA's proposed sunscreen rule, published in 84 Federal Register 6,204 (Feb. 26, 2019), and including measures in the final sunscreen monograph, to help address the issues outlined in this Petition;

5) develop guidance documents for the analysis of benzene in sunscreen products;

6) review and update the current FDA guidance "Q3C – Tables and List, Guidance for Industry" to include guidance for the acceptable concentration of benzene for drug products, such as sunscreens, that do not require benzene for manufacturing and do not constitute a "significant therapeutic advance," or potentially expand the current statement that benzene "should not be employed in the manufacture of drug substances" to clarify that there is no acceptable level of benzene and define a reasonable limit of detection;

7) review and update the current FDA guidance "Q3C – Tables and List, Guidance for Industry" to include guidance on the permitted daily exposure of benzene for drug products that do not require benzene for manufacturing and do not constitute a "significant therapeutic advance" and separately for drug products that require benzene for manufacturing and constitute a "significant therapeutic advance";

8) develop guidance documents defining the mass of a standard daily total application of sunscreen, which may include multiple discrete applications, so that a daily exposure of benzene can be calculated for sunscreen products;

9) request a recall of identified batches of after-sun care cosmetic products on the basis that, due to contamination with a known human carcinogen, these products are adulterated under Section 601 of the FDCA (21 U.S.C. § 361) and misbranded under Section 602 (21 U.S.C. § 362);

10) review and update regulation and published guidance for cosmetic products to include limitations on various impurities that pose known risks to human health and include benzene in such updates;

11) consider working with the United States Environmental Protection Agency on a joint initiative to address benzene contamination and potentially enter into a formal agreement



committing to increase collaboration and coordination in areas of mutual interest relating to benzene contamination;

12) support the increasing number of independent drug quality testing programs in the United States by convening workshops, stakeholder meetings and providing other resources at FDA's disposal to further encourage and connect such programs; and

13) promulgate rules or administrative orders requiring robust independent chemical batch-level testing and verification of the chemical content of batches of drugs and other regulated consumer products and, while these are pending, issue guidance requesting such testing and verification.

### Background on Petitioner

Valisure operates an analytical laboratory that is accredited to International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238). Valisure is registered with the Drug Enforcement Administration (License # RV0484814) and FDA (FEI #: 3012063246). Valisure's mission is to help ensure the safety, quality and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard methods to test medications and consumer products distributed in the United States.

In an August 7, 2018, inspection of Valisure's facilities by FDA, it was determined that since Valisure's unique testing facility is not a part of the pharmaceutical manufacturing system and does not perform release testing, stability testing or any related services for pharmaceutical manufacturers, Valisure did not require FDA registration. However, Valisure has elected to maintain voluntary registration status with FDA. Valisure also received guidance that since it operates outside of the manufacturing industry using the appropriate ISO guidelines as opposed to GMPs, any product failures or concerns that Valisure identifies should be reported back to the pharmaceutical industry. Valisure has complied with this guidance and routinely provides reports to applicable parties in the pharmaceutical industry.

Given the high potential risk to public safety, Valisure seeks to utilize this Citizen Petition to bring these concerns directly to the attention of the Commissioner and FDA, and to request that they take prompt action.

### B.  Statement of Grounds

In addition to the information described above, which is incorporated by reference, Valisure provides the following as its statement of grounds. FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component



of a drug product, and only if its use is "unavoidable" should a strict concentration limit of 2 ppm apply.[4]

There is a recent history of broad drug product recalls due to contamination with probable human carcinogens. Specifically, there have been a multitude of manufacturer recalls of medications, such as valsartan, irbesartan, losartan,[11] ranitidine, nizatidine,[12] and metformin,[13] due to the detection of the Group 2, "probable human carcinogen" N-Nitrosodimethylamine ("NDMA") in excess of FDA limits. FDA limits for NDMA are defined in both parts per million ("ppm") and permissible daily intake, which is held constant at a specified nanogram level ("ng") per day for all drug products.[14]

Having a constant permissible daily intake or exposure is critical when there is variability in product size and exposures per day; a situation particularly relevant to an individual's application of sunscreen and after-sun care products. Petitioner is not aware of any FDA guidance on a permissible daily exposure for benzene in any drug product, including sunscreen, or cosmetic product, including after-sun care products, and requests urgent action on behalf of FDA to issue guidance to fill this gap. Valisure's March 24, 2021 Citizen Petition on benzene contamination in hand sanitizer[15] and the recent recalls of certain hand sanitizer products due to the presence of benzene and other contaminants[16, 17] further underscores the necessity to better regulate benzene and its apparent broad prevalence in the drug and consumer product supply chains.

Although the dangers and carcinogenic potential of nitrosamines, like the aforementioned compound NDMA, have been well documented since the 1960s and there are important studies

[11] Food and Drug Administration. *Search List of Recalled Angiotensin II Receptor Blockers (ARBs) Including Valsartan, Losartan and Irbesartan* (September 23, 2019) (https://www.fda.gov/drugs/drug-safety-and-availability/search-list-recalled-angiotensin-ii-receptor-blockers-arbs-including-valsartan-losartan-and).

[12] Food and Drug Administration. *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (April 16, 2020) (https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine)

[13] Food and Drug Administration. *FDA Updates and Press Announcements on NDMA in Metformin* (October 5, 2020) (https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-metformin)

[14] Food and Drug Administration. *FDA updates table of interim limits for nitrosamine impurities in ARBs* (February 28, 2019) (https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan)

[15] Valisure's Citizen Petition on Hand Sanitizer Products Containing Benzene Contamination (filed March 24, 2021) (https://www.regulations.gov/document/FDA-2021-P-0338-0001).

[16] Food and Drug Administration. Scentsational Soaps & Candles, Inc. Issues Voluntary Nationwide Recall of Scented Hand Sanitizers Due to the Presence of Methanol (Wood Alcohol), Benzene and Acetaldehyde (April 28, 2021) (https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/scentsational-soaps-candles-inc-issues-voluntary-nationwide-recall-scented-hand-sanitizers-due)

[17] Food and Drug Administration. Scentsational Soaps & Candles, Inc. Voluntarily Expands Nationwide Recall of Scented Hand Sanitizers Due to the Presence of Methanol (Wood Alcohol), Benzene and Acetaldehyde (May 13, 2021) (https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/scentsational-soaps-candles-inc-voluntarily-expands-nationwide-recall-scented-hand-sanitizers-due#recall-announcement)



related to recent medication contamination findings,[18, 19] a direct link to cancer in humans has not yet been established. In contrast to nitrosamines, classified as "probable human carcinogens," benzene has long been directly associated with cancer in humans and classified as a "known human carcinogen" with persistent exposure as low as 0.8 ppm.[20] The hematotoxicity of benzene[21] has been described as early as 1897. A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe," [22] which is a comment reiterated in a 2010 review of benzene research specifically stating, "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion." [23] According to the American Cancer Society:[24]

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.

Valisure engaged Boston Analytical, Inc., a GMP-compliant laboratory, to utilize the industry standard USP <467> Residual Solvents Procedure on a selected product using gas chromatography flame ionization detection ("GC-FID") instrumentation, the results of which are shown in Table 2. Although the industry standard USP method concluded benzene was present above the restricted limit, there was concern over the possibility that any impurities or other compounds in the products could have overlapping retention times. Therefore, Valisure elected to utilize gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation and utilizing selected ion chromatograms. Gas

---

[18] Braunstein LZ, Kantor ED, O'Connell K, Hudspeth AJ, Wu Q, Zenzola N, Light D. Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions. *Journal of the American Medical Association Network Open*. 2021;4(1):e2034766. doi:10.1001/jamanetworkopen.2020.34766 (https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2775727)

[19] White CM. Ranitidine's N-nitrosodimethylamine Problem May be Tip of the Iceberg. *Journal of the American Medical Association Network Open*. 2021;4(1):e2035158. doi:10.1001/jamanetworkopen.2020.35158 (https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2775725)

[20] Glass, Deborah et. al. (2003). Leukemia Risk Associated With Low-Level Benzene Exposure. *Epidemiology* (Cambridge, Mass.). 14. 569-77. 10.1097/01.ede.0000082001.05563.e0. (https://journals.lww.com/epidem/Fulltext/2003/09000/Leukemia_Risk_Associated_With_Low_Level_Benzene.11.aspx)

[21] Santesson GG. 1897. Uber chronische Vergiftungen mit steinkohlen Benzin. Vier todes falle. Arch. Hyg. 31: 336–76

[22] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54 (https://www.cabdirect.org/cabdirect/abstract/19402700388)

[23] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148 (https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646)

[24] American Cancer Society. *Benzene and Cancer Risk* (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)



chromatography conditions followed USP <467> with modifications to reduce run time that closely mirror those recommended by FDA in its August 24, 2020 guidance for impurities detection in hand sanitizer, which includes benzene analysis.[25] Valisure engaged the Chemical and Biophysical Instrumentation Center at Yale University to utilize GC-MS analysis on multiple selected sunscreen and after-sun care products, the results of which are shown in Tables 2 – 5.

Evaluating multiple methods had been useful in past drug product contaminations[26] and was performed here as well to help ensure validity of these highly concerning results. The use of high-resolution MS (GC-HRMS) for greater mass accuracy was employed for the identification and quantification of benzene in selected sunscreen products and confirmed both the identity and levels of contamination beyond 2 ppm.

As Valisure has noted in previous FDA Citizen Petitions, some GC-MS methodologies can lead ingredients to break down into a suspected analyte due to elevated GC oven temperatures during analysis breaking down an inherently unstable pharmaceutical ingredient. Valisure identified such a situation in its September 13, 2019 FDA Citizen Petition regarding the drug ranitidine, and Valisure therefore developed modifications to the existing methodologies to lower temperature and prevent degradation.[27] The GC-MS methodologies described in this petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation.[28, 29]

Due to the presence of phenyl groups (similar chemical structures to benzene)[30] in the molecules of some sunscreen active ingredients, Valisure investigated the possibility of six sunscreen active ingredients (avobenzone, oxybenzone, octisalate, octinoxate, homosalate, and octocylene) forming benzene from degradation by the aforementioned GC-MS analytical method through analysis of pure reference standards at concentrations relevant to typical sunscreen products, and

---

[25] Food and Drug Administration. FDA Guidance Document (August 24, 2020) *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers* (https://www.fda.gov/media/141501/download)

[26] Wu, Qian; et. al. (2020): A Broadly Accessible Liquid Chromatography Method for Quantification of Six Nitrosamine Compounds and N,N-Dimethylformamide in Metformin Drug Products Using High Resolution Mass Spectrometry. ChemRxiv. Preprint. (https://doi.org/10.26434/chemrxiv.13202849.v1)

[27] Valisure FDA Citizen Petition Requesting to Recall Ranitidine (dated September 9, 2019) (https://www.regulations.gov/docket?D=FDA-2019-P-4281)

[28] Kyoung, H. et al. (2008). Evaluation of headspace-gas chromatography/mass spectrometry for the analysis of benzene in vitamin C drinks; pitfalls of headspace in benzene detection. Biomedical Chromatography, Vol. 22, p. 900-905 (https://analyticalscience.wiley.com/do/10.1002/sepspec.19271ezine/full/)

[29] Liu, H. et al. (2011) A general static-headspace gas chromatographic method for determination of residual benzene in oral liquid pharmaceutical products. J Pharm Biomed Anal. Vol. 54(2), p. 417-21. doi: 10.1016/j.jpba.2010.09.006. (https://www.sciencedirect.com/science/article/abs/pii/S0731708510005182?via%3Dihub)

[30] Nomenclature of Benzene Derivatives. (2019, June 5). *LibreTexts*. (https://chem.libretexts.org/@go/page/30650)



no substantive benzene was detected. Thus, the presence of benzene appears to be from contamination in the identified sunscreen products.

Valisure acquired sunscreen and after-sun care product samples from many retailers and in many different formulations. Sunscreen products are often available in dozens of formulations from numerous companies, and it is estimated by FDA that over 11,000 sunscreen products are on market in the United States.[31] After-sun care products are also diverse, though not broadly registered with FDA, since many do not contain a National Drug Code. Although Valisure has made a good faith effort to obtain samples reasonably representative of the general supply, many brands and formulations are not included in Valisure's analysis presented in this Petition. Even in this limited survey of certain available sunscreen and after-sun care products within the United States, multiple samples contained significantly detectable benzene and some batches contained up to 3.1 times the conditionally restricted limit. There was significant variability from batch to batch, even within a single brand, underscoring the importance of batch-level chemical analysis and the necessity of overall increased quality surveillance of these pharmaceutical and consumer products.

Valisure's results will be of significant concern to medical practitioners who endeavor to recommend safe sunscreens and to understand the implications of recent FDA findings showing sunscreen active ingredients are absorbed into the bloodstream even after single use.[32] Furthermore, a study by researchers at Health Canada's Bureau of Chemical Hazards has shown that the application of sunscreen specifically increases the absorption rate of benzene through the skin.[33] The clear evidence that benzene is associated with carcinogenic effects, specifically on blood-related tissues in humans, makes this especially concerning for the health impact of exposure to contaminated sunscreen products.

Beyond the significant concern for public health, there is also evidence that sunscreen products in general, and benzene itself, pose a serious risk to the environment, marine ecosystems, and United States waterways. FDA announced on May 12, 2021 a notice of intent to prepare an Environmental Impact Statement for certain sunscreen drug products due to their potential effects on coral and/or coral reefs.[34] The National Oceanic and Atmospheric Administration ("NOAA") has published reports and infographics intended to educate consumers regarding the

---

[31] Food and Drug Administration. *Technical Appendix to the Sunscreen Proposed Rule* (2019) (https://www.fda.gov/media/122883/download)
[32] Food and Drug Administration. *Shedding More Light on Sunscreen Absorption* (January 21, 2020) (https://www.fda.gov/news-events/fda-voices/shedding-more-light-sunscreen-absorption)
[33] J S Nakai 1, I Chu, A Li-Muller, R Aucoin. (1997).  Effect of environmental conditions on the penetration of benzene through human skin. *Journal of Toxicology and Environmental Health.* 1997 Aug 8;51(5):447-62 (https://pubmed.ncbi.nlm.nih.gov/9233379/)
[34] Food and Drug Administration. *Environmental Impact Statement (EIS) for Certain Sunscreen Drug Products* (May 12, 2021) (https://www.fda.gov/drugs/guidance-compliance-regulatory-information/environmental-impact-statement-eis-certain-sunscreen-drug-products)



potential for sunscreen products to threaten corals and other marine life.[35] Additionally, scientific papers published by NOAA have shown that benzene can be rapidly absorbed by fish[36] and short-term exposure (48 hr) to concentrations of benzene at parts per billion levels can significantly reduce survival of certain fish eggs.[37] Furthermore, NOAA has proposed that the use of sunscreen followed by swimming or showering may cause sunscreen chemicals to wash off and enter waterways,[38] an area of significant concern to the Environmental Protection Agency ("EPA"), which extensively regulates benzene. Strict EPA regulations on benzene are detailed in a report authored by the Agency for Toxic Substances and Disease Registry ("ATSDR"),[39] which stated:

> EPA has set 5 ppb[40] [equivalent of 0.005 ppm] as the maximum permissible level of benzene in drinking water. EPA has set a goal of 0 ppb for benzene in drinking water and in water such as rivers and lakes because benzene can cause leukemia.
> …
> EPA recommends 200 ppb [equivalent of 0.2 ppm] as the maximum permissible level of benzene in water for short-term exposures (10 days) for children.

The depth of experience with benzene regulation at EPA and the concern over environmental impact of benzene contamination and sunscreen ingredients may offer a rational basis for collaboration between FDA and EPA to expeditiously address the current lack of much needed benzene regulation in sunscreen and other products. Such collaboration could efficiently result in regulations applicable for all FDA regulated drug and cosmetic products. Precedence for FDA formally working with EPA through the execution of an agreement committing to increase collaboration and coordination in areas of mutual interest is found in the October 18, 2019 announcement of a Memorandum of Understanding between FDA, EPA and the United States Department of Agriculture ("USDA") regarding food waste.[41, 42]

---

[35] National Oceanic and Atmospheric Administration. *Skincare Chemicals and Coral Reefs* (February 26, 2021) (https://oceanservice.noaa.gov/news/sunscreen-corals.html)

[36] S Korn, N Hirsch, J W Struthsaker (1976). UPTAKE, DISTRIBUTION, AND DEPURATION OF 14C-BENZENE IN NORTHERN ANCHOVY, ENGRAULIS MORDAX, AND STRIPED BASS, MORONE SAXATILIS. *Fishery Bulletin*. 1976 March Vol 74, No. 3: 545-51 (https://spo.nmfs.noaa.gov/sites/default/files/pdf-content/1976/743/korn.pdf)

[37] J W Struthsaker (1977). EFFECTS OF BENZENE (A TOXIC COMPONENT OF PETROLEUM) ON SPAWNING PACIFIC HERRING, CLUPEA HARENGUS PALLASI. Fisher Bulletin. 1977 Vol 75, No. 1: 43-49 (https://spo.nmfs.noaa.gov/sites/default/files/pdf-content/1977/751/struhsaker.pdf)

[38] *Id*

[39] Agency for Toxic Substances and Disease Registry (August 2007). *Toxicological Profile for Benzene*. (https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf)

[40] Parts per Billion ("ppb"), 1 ppb is equivalent to one thousandth (1/1000) of 1 ppm

[41] Food and Drug Administration (October 30, 2019). *MOU 225-19-033*. (https://www.fda.gov/about-fda/domestic-mous/mou-225-19-033)

[42] Environmental Protection Agency (May 27, 2020). *Winning on Reducing Food Waste Federal Interagency Strategy* (https://www.epa.gov/sustainable-management-food/winning-reducing-food-waste-federal-interagency-strategy)



Although sunscreen products are considered drug products by FDA and many potentially dangerous chemical impurities are specifically limited for drug products (with the notable exception of benzene), there is comparably a significant lack of similar regulation for cosmetic products despite significant concern for increased consumer protection and regulatory action.[43, 44, 45] As FDA has acknowledged, the FDCA prohibits the marketing of adulterated or misbranded cosmetics in interstate commerce and specifies a product as adulterated if "it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under conditions of use as are customary and usual." [46] However, specifically defined limits of "poisonous or deleterious" substances, such as benzene, are not defined and should be reviewed and addressed by FDA.

Petitioner urges the Commissioner and FDA to expeditiously request recalls on the affected batches of products and to take other such actions outlined in this Petition as deemed appropriate.

## **Analytical Methods**

The method USP <467> Residual Solvents Procedure A was modified from flame ionization detection (FID) to mass spectrometry (MS) detection for benzene in sunscreen and after-sun care products. The sample preparation and headspace (HS) gas chromatography (GC) methods were also modified to fit different types of sunscreen and after-sun care product matrices (spray, lotion, and gel) and to allow shorter run time. Identification of benzene is based on the retention time matching to certified reference standards and mass spectral matching to benzene. Quantification of benzene is performed by comparing peak area of benzene in a sample to a validated 10-point calibration curve. Results in parts per million is determined by dividing the micrograms of benzene detected per sample by the grams of material used for each sample.

## Materials and Methods

Agilent 7890B GC equipped with 7697A headspace autosampler coupled with 5977B MS was utilized for sample analysis, and a DB-Select 624 UI, 60m × 0.32mm × 1.8μm GC column (Agilent Technology, Santa Clara, CA) was used to separate benzene from other compounds. Dimethyl sulfoxide (DMSO, GC Grade) was used for sample preparation (Thermo Fisher Scientific, Waltham, MA). Standard of benzene (99.8 % purity) and isotopic labeled benzene

[43] A Kaufman, B Rauenzahn, J Chung (May 1, 2021). *Does Cosmetics Regulation Need a Makeover? The Regulatory Review*. (https://www.theregreview.org/2021/05/01/saturday-seminar-does-cosmetic-regulation-need-makeover/)

[44] W F Watt (July 17, 2015). Time for a Makeover: Newly Proposed Cosmetic Safety Legislation. *American Bar Association* (https://www.americanbar.org/groups/litigation/committees/products-liability/practice/2015/time-for-makeover-newly-proposed-cosmetic-safety-legislation/)

[45] A McDougall (March 27, 2012). Cosmetics regulation needs a makeover, industry urges Congress. *Cosmetics Design* (https://www.cosmeticsdesign.com/Article/2012/03/28/Cosmetics-regulation-needs-a-makeover-industry-urges-Congress)

[46] Food and Drug Administration (March 8, 2021). *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated* (https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated)



standard ($d_3$-, 99.8% purity) was used for calibration, continuing calibration verification, retention time verification, and recovery determination (Sigma-Aldrich, St. Louis, MO). USP Class 1 residual solvents mixture was used for calibration confirmation (USP, Rockville, MD). All volumetric glassware used are Class A certified.

<u>Standard and Sample Preparation</u>
Benzene standard was diluted in DMSO. Calibration standards were prepared in 20-mL GC headspace vials to a total of 5 mL volume. Sunscreen and after-sun care product samples were dispensed into the GC headspace vials at approximately 500 mg and weighed, followed by adding 4.5 mL of DMSO to make up the final volume to approximately 5 mL and gently vortexing to mix. Five (5) mL of DMSO was used as blank samples.

<u>Instrumental Analysis</u>
<u>Table 1</u> summarizes the major instrumental parameters used for analysis of benzene in the sunscreen samples.

**Table 1**. Instrumental parameters optimized for benzene detection in sunscreen samples.

| HS Autosampler | | GC | | MS | |
|---|---|---|---|---|---|
| Oven temperature (Temp) | 37 °C | Carrier gas | Helium | Source Temp | 230 °C |
| Loop Temp | 55 °C | Inlet Temp | 220 °C | Quad Temp | 150 °C |
| Transfer line Temp | 175 °C | Column flow | 2 mL/min | Acquisition type | SIM |
| Vial equilibration | 20 minutes (min) | Split ratio | 5:1 | Gain factor | 1 |
| Injection time | 1 min | Oven Temp Gradient | 60 °C (12 min) > 240 °C at 40 °C/min | Solvent delay | 3 min |
| Vial shaking | 71 shakes/min | GC run time | 18.5 min | | |
| Fill pressure | 15 psi | | | | |

<u>Quality Assurance and Quality Control</u>
In some cases, trace levels of benzene were detected in blank samples and the peak area was subtracted from all standards and samples. Linear non-forcing through zero calibration curve was generated from the peak areas of the 10-point calibration standards. Calibration curve was accepted when the coefficient of determination $R^2$ was equal or greater than 0.995. Lower limit of detection (LLOD) and lower limit of quantification (LLOQ) were determined by spiking known amount of benzene into sunscreen samples that were pre-screened to be not detected for benzene or lower than the concentration of the lowest calibration standard. LLOD was 0.01 µg (equivalent to 0.02 ppm in sunscreen products) and LLOQ was 0.025 µg (equivalent to 0.05 ppm in sunscreen products). The measurement uncertainty was determined to be 25%. USP Class 1 residual solvent mixture was analyzed against the calibration and result of benzene agreed with certified concentration. All sunscreen and after-sun care samples with benzene concentration above LLOQ were analyzed in triplicates and reported herein. Values are given for quantification of 2-fold over LLOQ or 0.1 ppm. Therefore, for the data presented in this petition, Valisure is using the nomenclature that any benzene detection of 0.10 ppm or above is "significantly detected," and any detection below this value is described as "< 0.10 ppm" and warrants further investigation but is likely of less concern than products with a defined value of 0.10 ppm or higher.



## Analytical Findings

Using the GC-MS method described above for the determination of benzene, Valisure analyzed 294 unique batches from 69 brands of sunscreen and after-sun care products with the results detailed below. In summary, 78 product batches had detectable levels of benzene, 26 contained benzene in concentrations between 0.1 ppm and 2.0 ppm and 14 contained over 2 ppm. In Tables 2 – 5, an asterisk "*" denotes data generated by the Chemical and Biophysical Instrumentation Center at Yale University from a sample from the same lot and specific product package. Two asterisks "**" denotes data generated by Boston Analytical from a sample of the same lot and specific product package. For samples where benzene was detected, at least three samples from each batch were tested individually and the amount of benzene detected is reported as an average followed by the percent standard deviation of the results from replicate measurements.

**Table 2.** Product description and results of benzene analysis on various batches of sunscreen and after-sun care products in which benzene was detected at 2 ppm or higher.

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| Sun Bum | Gel | Cool Down Gel | N/A | 871760002005 | S0082C | – | N/A (Cosmetic Product) | 5.33 5.49* | 3% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 04721E02 | 2023-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 5.20 5.59* | 5% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 8140449A | – | N/A (Cosmetic Product) | 4.71 4.55* | 1% |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 4111849A | – | N/A (Cosmetic Product) | 3.58 3.93* | 4% |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | 2% |
| Fruit of the Earth | Gel | Aloe Vera Gel | N/A | 071661001200 | 6612940A | – | N/A (Cosmetic Product) | 2.78 2.94* | 6% |



**Table 3.** Product description and results of benzene analysis on various batches of sunscreen and after-sun care products in which benzene was detected at 0.1 ppm to 2 ppm.

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 17820E01 | 2023-05 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 1.99 1.66* | 8% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 06420E05 | 2022-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 1.44 1.06* | 6% |
| Raw Elements | Lotion | Eco Formula Sunscreen Lotion SPF 30 | 30 | 858855002003 | 58J19 | 2021-07 | Zinc Oxide 23% | 1.35 1.31* | 9% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 1101990A | -- | N/A (Cosmetic Product) | 0.90 1.04* | 3% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 26119E01 | 2022-08 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 0.87 | 9% |
| CVS Health | Gel | After-sun Aloe Vera Moisturizing Gel | N/A | 050428324837 | 4500231A | -- | N/A (Cosmetic Product) | 0.81 0.98* | 2% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 08119F36 | 2022-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 0.77 | 4% |
| SunBurnt | Gel | Advanced After-Sun Gel | N/A | 324330210060 | 62R20 | 2022-12 | N/A (Cosmetic Product) | 0.75 0.87* | 2% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 32619E06 | 2021-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 0.73 | 9% |
| Goodsense | Lotion | Sunscreen Lotion SPF 30 | 30 | 846036001143 | 070606920 | 2022-07 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 0.71 | 4% |
| Neutrogena | Spray | CoolDry Sport Water-Resistant Sunscreen Spray SPF 70 | 70 | 086800100379 | 33719E01 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 0.66 | 5% |
| Neutrogena | Spray | Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 30 Spray | 30 | 086800100386 | 28219E02 | 2021-09 | Avobenzone 3%, Homosalate 8%, Octisalate 5%, Octocrylene 8% | 0.49 | 18% |
| Banana Boat | Spray | Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 100 | 079656050820 | 200910346 | 2023-02 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 0.41 0.43* | 7% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 35219E05 | 2021-11 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 0.41 | 8% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 29519E02 | 2021-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 0.37 0.38* | 2% |
| Banana Boat | Spray | UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4 | 4 | 79656046632 | 200944022 | 2023-03 | Homosalate 3.0%, Octocrylene 1.0% | 0.36 | 18% |
| Banana Boat | Spray | Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 100 | 079656050820 | 200273634 | 2022-12 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 0.19 | 11% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 13019F84 | 2022-04 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 0.18 | 10% |
| Neutrogena | Spray | Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 45 | 45 | 086800100393 | 15719F83 | 2022-05 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 2.35%, Oxybenzone 6% | 0.15 | 12% |
| Banana Boat | Spray | Ultra Sport Clear Sunscreen Spray SPF 100 | 100 | 79656050806 | 201060792 | 2023-03 | Avobenzone 3.0%, Homosalate 10.0%, Octisalate 5.0%, Octocrylene 10.0%, Oxybenzone 6.0% | 0.15 | 4% |
| Neutrogena | Lotion | Ultra Sheer Dry-Touch Water Resistant Sunscreen SPF 70 | 70 | 86800687702 | 0090L0069 | 2022-06 | Avobenzone 3.0%, Homosalate 15.0%, Octisalate 5.0%, Octocrylene 2.8%, Oxybenzone 6.0% | 0.13 | 73% |
| Neutrogena | Spray | CoolDry Sport Water-Resistant Sunscreen Spray SPF 50 | 50 | 086800100362 | 15619F25 | 2022-05 | Avobenzone 2.7%, Homosalate 9%, Octisalate 4.5%, Octocrylene 6%, Oxybenzone 4.5% | 0.13 | 4% |
| TopCare Everyday | Lotion | Ultimate Sheer Sunscreen Lotion SPF 70 | 70 | 036800459007 | 9533119A | 2021-11 | Avobenzone 3%, Homosalate 10%, Octisalate 3%, Octocrylene 7%, Oxybenzone 6% | 0.12 0.16* | 6% |
| EltaMD | Spray | UV Aero Broad-Spectrum Full-Body Sunscreen Spray, SPF 45 | 45 | 390205025879 | 67155I | 2022-11 | Zinc Oxide 9.3%, Octinoxate 7.5% | 0.11 0.17* | 18% |
| EltaMD | Spray | UV Aero Broad-Spectrum Full-Body Sunscreen Spray, SPF 45 | 45 | 390205025879 | 67155H | 2022-11 | Zinc Oxide 9.3%, Octinoxate 7.5% | 0.11 | 9% |
| Banana Boat | Spray | Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 100 | 079656050820 | 200243635 | 2022-12 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 0.11 | 19% |



**Table 4.** Product description and results of benzene analysis on various batches of sunscreen and after-sun care products in which benzene was detected at below LLOQ.

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Live Better by CVS Health | Spray | Body Mineral Spray Sunscreen SPF 50 | 50 | 050428538913 | 4270950B | 2022-03 | Titanium Dioxide 3.5%, Zinc Oxide 7.25% | < 0.1 | 5% |
| CVS Health | Lotion | Ultra Sheer Broad Spectrum Sunscreen Lotion SPF 100 (050428415528) | 100 | 050428616062 | 5881760A | 2022-06 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | < 0.1 | 1% |
| Ethical Zinc | Lotion | Natural Clear Zinc Sunscreen SPF 50+ | 50+ | 9354028000025 | A0747 | 2022-09 | Zinc Oxide 22.0% | < 0.1 | 25% |
| Banana Boat | Spray | Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15 | 15 | 79656044836 | 202023826 | 2023-06 | Avobenzone 1.5%, Homosalate 5.0%, Octocrylene 3.5% | < 0.1 | 11% |
| Babyganics | Spray | Kid's Sunscreen Continuous Spray - SPF 50 | 50+ | 813277017554 | 3713449A | 2021-12 | Octisalate 5%, Zinc Oxide 15% | < 0.1 | 24% |
| Walgreens | Lotion | Sport Lotion Sunscreen SPF 50 | 50 | 049022977464 | 2142499A | 2021-09 | Avobenzone 3%, Homosalate 10%, Octisalate 4.5%, Octocrylene 8% | < 0.1 | 12% |
| Banana Boat | Spray | Ultra Defense Ultra Mist Clear Sunscreen Spray SPF 100 | 100 | 079656050813 | 191932590 | 2022-06 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | < 0.1 | 11% |
| CVS Health | Lotion | Ultra Sheer Lotion Broad Spectrum Sunscreen SPF 45 | 45 | 050428620083 | 6060370C | 2022-02 | Avobenzone 3.0%, Homosalate 10.0%, Octisalate 5.0%, Octocrylene 2.8% | < 0.1 | 3% |
| Raw Elements | Lotion | Eco Formula Sunscreen Lotion Tin SPF 30 | 30 | 858855002065 | 21J19 | 2021-07 | Zinc Oxide 23% | < 0.1 | 11% |
| Coppertone | Spray | Whipped Sunscreen Lotion Spray SPF 50 | 50 | 041100007094 | 9J03CS | 2021-08 | Avobenzone 3%, Homosalate 9%, Octisalate 4.5%, Octocrylene 9% | < 0.1 | 10% |
| CVS Health | Lotion | Ultra Sheer Broad Spectrum Sunscreen Lotion SPF 100 (050428415528) | 100 | 050428616062 | 7470720B | 2022-03 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | < 0.1 | 7% |
| CVS Health | Lotion | 70 Beach Guard Sun Screen SPF 70 | 70 | 050428402528 | 5980339C | 2022-01 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 4.5%, Oxybenzone 4% | < 0.1 | 70% |
| Max Block | Lotion | Sunscreen Lotion 4 Fl Oz Broad Spectrum Water Resistant SPF 30 | 30 | 639277292865 | 91047 | 2022-01 | Avobenzone 3%, Homosalate 7.5%, Octisalate 5%, Octocrylene 5% | < 0.1 | 70% |
| Walgreens | Lotion | Broad Spectrum Sport SPF 50 Sunscreen | 50 | 049022977471 | 4440660B | 2022-03 | Avobenzone 3%, Homosalate 10%, Octisalate 4.5%, Octocrylene 8% | < 0.1 | 10% |
| CVS Health | Lotion | Ultra Sheer Broad Spectrum Sunscreen Lotion SPF 100 (050428415528) | 100 | 050428616062 | 1362040A | 2022-07 | Avobenzone 3.0%, Homosalate 15.0%, Octisalate 5.0%, Octocrylene 10.0%, Oxybenzone 6.0% | < 0.1 | 4% |
| TopCare Everyday | Lotion | Sport Sunscreen Lotion SPF 70 | 70 | 036800456303 | 0440090A | 2023-01 | Avobenzone 3%, Homosalate 10%, Octisalate 3%, Octocrylene 7%, Oxybenzone 6% | < 0.1 | 27% |
| Max Block | Lotion | Sport Sunscreen Lotion Water Resistance Blue 30 SPF | 30 | 639277292063 | 00189 | 2022-03 | Avobenzone 3%, Homosalate 7.5%, Octisalate 5%, Octocrylene 5% | < 0.1 | 7% |
| Walgreens | Lotion | Sunscreen Sport SPF 50 | 50 | 049022977457 | 3232629A | 2021-09 | Avobenzone 3%, Homosalate 10%, Octisalate 4.5%, Octocrylene 8% | < 0.1 | 10% |
| Max Block | Lotion | Sunscreen Lotion 4 Fl Oz Broad Spectrum Water Resistant SPF 30 | 30 | 639277292865 | 91188 | 2021-12 | Avobenzone 3%, Homosalate 7.5%, Octisalate 5%, Octocrylene 5% | < 0.1 | 51% |
| Max Block | Lotion | Sunscreen Lotion 4 Fl Oz Broad Spectrum Water Resistant SPF 30 | 30 | 639277292865 | 91188B | 2021-12 | Avobenzone 3%, Homosalate 7.5%, Octisalate 5%, Octocrylene 5% | < 0.1 | 7% |
| Banana Boat | Spray | Kids Sport Sunscreen Lotion Spray SPF 50 | 50 | 079656020526 | 192546543 | 2022-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 6% | < 0.1 | 19% |
| TopCare Everyday | Lotion | Ultimate Sheer Sun Lotion Sunscreen SPF 55 | 55 | 036800456242 | 9543129A | 2021-11 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 7% | < 0.1 | 9% |



Page 15

| Solimo | Lotion | Sheer Face Sunscreen Lotion SPF 55 (842379152474 UPC Description) | 55 | 842379167430 | 0495376 | 2022-07 | Avobenzone 3%, Homosalate 12%, Octisalate 5%, Octocrylene 10% | < 0.1 | 6% |
|---|---|---|---|---|---|---|---|---|---|
| Max Block | Lotion | Sport Sunscreen Lotion Water Resistance Blue 30 SPF | 30 | 639277292063 | 91051 | 2022-02 | Avobenzone 3%, Homosalate 7.5%, Octisalate 5%, Octocrylene 5% | < 0.1 | 39% |
| Walgreens | Lotion | Sunscreen Sport SPF 50 | 50 | 049022977457 | 3222629B | 2021-09 | Avobenzone 3%, Homosalate 10%, Octisalate 4.5%, Octocrylene 8% | < 0.1 | 10% |
| Neutrogena | Lotion | Sheer Zinc Dry-Touch Face Sunscreen SPF 50 | 50 | 086800110811 | 2979L1236 | 2022-03 | Zinc Oxide 21.6% | < 0.1 | 8% |
| CVS Health | Spray | Sport Clear Spray Sunscreen SPF 100+ | 100+ | 050428618868 | 7062049B | 2021-07 | Avobenzone 3%, Homosalate 15%, Octinoxate 2%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | < 0.1 | 39% |
| La Roche-Posay | Spray | Anthelios Sunscreen Lotion Spray SPF 60 | 60 | 883140500841 | 201401230 | 2022-02 | Avobenzone 2.68%, Homosalate 9.60%, Octisalate 2.88%, Octocrylene 5.38%, Oxybenzone 3.46% | < 0.1 | 79% |
| Banana Boat | Spray | Simply Protect Kids Sunscreen Spray SPF 50+ | 50 | 079656024500 | 193639916 | 2022-11 | Avobenzone 3%, Homosalate 9%, Octisalate 4.5%, Octocrylene 6% | < 0.1 | 7% |
| Equate | Lotion | Kids Broad Spectrum Sunscreen Lotion, SPF 50 | 50 | 681131002462 | 3941300A | 2023-05 | Titanium Dioxide 3.1%, Zinc Oxide 4.0% | < 0.1 | 13% |
| CVS Health | Spray | Sheer Mist Spray Broad Spectrum Uva/Uvb Cont. Spray Sunscreen SPF 70 | 70 | 050428449240 | 2700189A | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | < 0.1 | 15% |
| Max Block | Lotion | Sport Sunscreen Lotion Water Resistance Blue 30 SPF | 30 | 639277292063 | 91186 | 2021-12 | Avobenzone 3%, Homosalate 7.5%, Octisalate 5%, Octocrylene 5% | < 0.1 | 5% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 32318F63 | 2021-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | < 0.1 | 9% |
| Sun Bum | Lotion | Oxy Free Zinc Oxide Sunscreen Lotion - SPF 50 | 50 | 871760003903 | S9351AN | 2021-12 | Homosalate 10%, Octisalate 5%, Octocrylene 10%, Zinc Oxide 7% | < 0.1 | 24% |
| Aveeno | Lotion | Baby Continuous Protection Sensitive Skin Sunscreen Lotion Broad Spectrum SPF 50 | 50 | 381371164509 | 2419L1022 | 2022-02 | Zinc Oxide 21.6% | < 0.1 | 58% |
| Sun Bum | Spray | After Sun Cool Down Aloe Vera Spray | N/A | 871760003187 | S1039D | – | N/A (Cosmetic Product) | < 0.1 | 6% |
| Walgreens | Gel | After Sun Gel | N/A | 049022507326 | 0701970A | – | N/A (Cosmetic Product) | < 0.1 | 2% |
| Up & Up | Gel | Clear Aloe Vera Gel | N/A | 371661826163 | 9701930A | – | N/A (Cosmetic Product) | < 0.1 | 16% |

**Table 5.** Product description of various batches of sunscreen for which benzene was not detected through initial analysis of at least one sample from each batch. Due to length of this table, it is contained in <u>Attachment A</u> to this Petition.

<u>Recall Request and Other Actions</u>

This Petition seeks to have the Commissioner and FDA request recalls for the identified batches of sunscreen products, consistent with FDA's mandate to ensure the safety of the drug supply in America. The 40 batches in <u>Table 2</u> and <u>Table 3</u> have significantly detected benzene and should be recalled.

Such recalls are important for public safety. As indicated in <u>Tables 2 - 5</u>, there is significant batch-to-batch variation in benzene content, but many batches of sunscreen contain no detectable



benzene and thus recalls should not overly burden the distribution chain or impact the availability of sunscreen for use by the public.

Petitioner further requests updates and revisions to the current "Q3C – Tables and List, Guidance for Industry" that consider drug products, such as sunscreens, whose manufacture does not require benzene and that do not constitute a significant therapeutic advance, and where the common exposure per individual can vary widely. Regarding the conditional restriction limit on benzene, a substantially lower limit than 2 ppm should be set for such products where, according to current FDA guidance, benzene should not be used at any point in manufacturing, or FDA should potentially expand the current statement that benzene "should not be employed in the manufacture of drug substances" to clarify that there is no acceptable level of benzene and define a reasonable limit of detection. Regarding the highly variable exposure of an individual to sunscreen products, which can relate to variations in application amount per individual and number of applications per day, FDA should update current guidance with a daily permissible exposure limit, as is the case with nitrosamine impurities. To properly quantify daily exposure, FDA should provide further guidance on the amount of sunscreen product and number of applications that a daily permissible exposure limit should apply to.

Petitioner notes that recent studies authored by FDA personnel where sunscreen application was studied,[8, 9] defined the mass of an application of sunscreen by mass per surface area and the number of applications as four per day. With respect to mass, the referenced studies stated, "Sunscreen product was applied at 2 mg/cm$^2$ to 75% of body surface area (area outside of normal swim wear)" and most bodies measured approximately 1.85 m$^2$. This equates to approximately 28.5 g per sunscreen application. At the FDA conditional restriction limit of 2 ppm for benzene, 28.5 g of sunscreen would contain 57,000 ng of benzene in a single application which may reasonably be used 4 times per day, therefore amounting to 228,000 ng of benzene exposure per day. As aforementioned, the probable human carcinogen NDMA is restricted in drug products at concentrations similar to benzene, specifically 0.3 – 3.0 ppm in -sartan medication, and has a corresponding permissible daily intake of 96 ng. Using NDMA as a comparable benchmark, sunscreen products applied according to amounts consistent with FDA researchers' studies and contaminated at 2 ppm benzene, will expose an individual to 2,375 times the acceptable daily limit. In Valisure's limited evaluation of sunscreen products in the United States and utilizing the aforementioned benchmark, the highest benzene detection of 6.26 ppm equates to approximately 695,800 ng of benzene in one day or 7,248 times the NDMA limit. Sunscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total exposure. As a recent study by FDA researchers states, "Understanding the extent of systemic exposure of [sunscreen] products is important, as even a low percentage of systemic absorption could represent a significant systemic exposure." [8] This strongly underscores the need for a daily limit in addition to a concentration limit.



Many professionals have been concerned with the safety thresholds of sunscreen systemic exposure.[47] One researcher and clinician from Yale University commented to Valisure:

> "Considering that human skin has a large total surface area (~1.85 m$^2$), and that ~28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products. The total mass of sunscreen required to cover and protect the human body, in single daily application or repeated applications daily, means that even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene." [48]

In addition, for the reasons stated above, Valisure requests that FDA conduct examinations and investigation under Section 702 (a) of the FDCA (21 U.S.C. § 372(a)) regarding these products, their manufacturing processes, and the manufacturer submissions made for FDA approval under 704 (a)of the FDCA (21 U.S.C. § 374(a)), and effect labeling revisions as needed.  Further, FDA should provide information to the public regarding these drug products under Section 705(b) of the FDCA (21 U.S.C. § 375(b)). Given the significant health benefit of using sunscreen to protect against harmful solar radiation and the potential that the alarming nature of this Petition's findings could deter individuals from using any sunscreen, Valisure would maintain that it is important for information provided to the public to clarify and underscore that this contamination has not been detected in all sunscreen products and that unadulterated sunscreen products are available and should continue to be utilized.

With regard to after-sun care products, this Petition urges FDA to request a recall of identified batches of after-sun care products on the basis that they contain benzene, a known human carcinogen and, as such, a deleterious substance which may render the affected products injurious to users under the conditions of use in the labeling, or under customary and usual conditions. For this reason, FDA should find that these products are adulterated under Section 601 of the FDCA (21 U.S.C. § 361) and misbranded under Section 602 (21 U.S.C. § 362).

<u>Independent, Batch-level Testing and Certification of Drug Products in the United States</u>

Petitioner is also requesting that FDA promulgate rules or issue administrative orders requiring robust independent chemical batch-level testing and verification of sunscreen products that are regulated as drugs by FDA, or revise and reissue, as necessary and appropriate, FDA's proposed sunscreen rule, published in 84 Federal Register 6,204 (Feb. 26, 2019), and include measures in the final sunscreen monograph to help address these issues. In the interim, while these are pending, FDA should issue formal guidance recommending such testing and verification.

---

[47] Wang, J. and Ganley, C.J. (2019), *Safety Threshold Considerations for Sunscreen Systemic Exposure: A Simulation Study*. Clin. Pharmacol. Ther., 105: 161-167. (https://doi.org/10.1002/cpt.1178)
[48] Email from Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University, New Haven, CT.



This is necessary in order to serve public health and help protect Americans from adulterated drug products, an issue of growing concern. Grounds for this request are also rooted in strong support from the medical community, as evidenced by a 2019 resolution from the American College of Cardiology ("ACC"), calling for the American Medical Association to advocate for legislation requiring independent testing and verification of the chemical content of batches of pharmaceuticals. The resolution is at <u>Attachment B.</u>

Particularly with quality issues that broadly affect a subset of brands and specific batches of consumer products, independent batch-level testing should be made known to an individual or any purchaser though visible certification on product labels. Independent certification of products can help prevent adulterated products from entering the market and can help ensure consumers, patients, and practitioners continue to feel safe using and recommending or prescribing certified drug and cosmetic brands of products, which are important for public health, such as sunscreens.

In addition, Petitioner requests that FDA support the expanding number of independent drug quality analysis programs, including that recently announced at The University of Kentucky,[49] through various means available to it. This may include convening new focused meetings, seminars, symposiums, and similar gatherings to connect programs and healthcare stakeholders that could benefit by learning from and augmenting such programs. It may also include adding such a topic to existing meetings, seminars, symposiums, and similar gatherings when appropriate.

As Valisure's results indicate, relying on industry self-reporting of analytical results is not sufficient protection from potentially dangerous contamination. A proactive drive for broad, independent testing should be combined with decisive action on the part of regulators to quickly request recalls and take other actions as appropriate.

## C.  <u>Environmental Impact</u>

Petitioner claims a categorical exclusion under 21 C.F.R. § 25.30, and believes that this Petition qualifies for a categorical exclusion from the requirement to submit an environmental assessment or environmental impact statement. To Petitioner's knowledge, no extraordinary circumstances exist.

## D.  <u>Economic Impact</u>

Pursuant to 21 C.F.R. § 10.30(b), economic impact information will be submitted by the Petitioner only upon request of the Commissioner following review of this Petition.

---

[49] Chapin, Elizabeth; Willett, Kristi. (October 1, 2020) UK Drug Quality Testing Leads to Petition to Recall Injectable Drug. *University of Kentucky* ([http://uknow.uky.edu/research/uk-drug-quality-testing-leads-petition-recall-injectable-drug](http://uknow.uky.edu/research/uk-drug-quality-testing-leads-petition-recall-injectable-drug))



## E.  Certification

The undersigned certifies that, to the best knowledge and belief of the undersigned, this petition includes all the information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.


Respectfully submitted,


David Light
Valisure, LLC
*Chief Executive Officer*
5 Science Park
New Haven, CT 06511
Phone: 833-497-7370
Fax: 203-497-7371


Kaury Kucera, PhD
Valisure, LLC
*Chief Scientific Officer*
5 Science Park
New Haven, CT 06511
Phone: 833-497-7370
Fax: 203-497-7371


Qian Wu, PhD
Valisure, LLC
*Head of Global Analytics*
5 Science Park
New Haven, CT 06511
Phone: 833-497-7370
Fax: 203-497-7371

FILED
2021 Sep-03  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit C

VALISURE NEWS

# Valisure Detects Benzene in Sunscreen

Team Valisure



## VALISURE DETECTS HIGH LEVELS OF KNOWN HUMAN CARCINOGEN BENZENE IN SEVERAL SUNSCREEN PRODUCTS AND REQUESTS FDA ACTIONS

78 sunscreen and after-sun care products contained benzene, an industrial chemical known to cause cancer and other potentially serious health risks

**NEW HAVEN, CT – MAY 25, 2021** – Valisure LLC has tested and detected high levels of benzene, a known human carcinogen, in several brands and batches of sunscreen, which are considered drug products by the Food and Drug Administration (FDA), as well as in after-sun care products, which are generally regulated by FDA as cosmetics. Benzene is known to cause cancer in humans according to the **U.S. Centers for Disease Control and Prevention**

**(https://emergency.cdc.gov/agent/benzene/basics/facts.asp)**, the U.S. Department of Health and Human Services, the World Health Organization, and other regulatory agencies. The National Institute for Occupational Safety and Health (NIOSH) defines **benzene as a carcinogen (https://www.cdc.gov/niosh/npg/npgd0049.html)** and lists "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes. 27% of samples tested by Valisure contained detectable benzene and some batches contained up to three times the conditionally restricted FDA concentration limit of 2 parts per million (ppm).

Valisure is asking for a recall of the contaminated batches and requesting FDA better define limits for benzene contamination in drug and cosmetic products. It is important to note that not all sunscreen products contain benzene and that uncontaminated products are available, should continue to be used, and are important for protecting against potentially harmful solar radiation.

**Valisure's FDA Citizen Petition**: <u>**Complete Valisure's FDA Citizen Petition on Sun Care**</u>
<u>**Products**</u> (https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf)(All attachments and other resources linked below.)

**Valisure is accepting sunscreen products for analysis[a] at no cost**: <u>**Sunscreen Crowdsourcing**</u>
<u>**Study Link**</u> (https://www.valisure.com/valisure-studying-sun-care-product-contamination-2/)

**ConsumerLab.com has published a review[b]** for its members of the Valisure data suggesting products to avoid and which might be safest with regard to the benzene results. **<u>Link to review</u>** (https://www.consumerlab.com/answers/benzene-contamination-in-sunscreen-and-aftersun/benzene-sunscreen/)

FDA currently recognizes the serious danger of benzene and lists it as a "**Class 1 solvent (https://www.fda.gov/media/71737/download)**" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity...However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted to 2 ppm for these special circumstances. Being that many of the tested sunscreen and after-sun care products did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture and considering the long history of widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance; therefore, any significant detection of benzene should be deemed unacceptable.

The toxicity of benzene in humans has been well established for over 120 years. The hematotoxicity of benzene has been described as early as 1897. A **study from 1939 (https://www.cabdirect.org/? target=%2fcabdirect%2fabstract%2f19402700388)** on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe," which is a comment

reiterated in a **2010 review of benzene research**
**(https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646)** specifically
stating "There is probably no safe level of exposure to benzene, and all exposures constitute some
risk in a linear, if not supralinear, and additive fashion." Benzene is specifically associated with **blood
cancers** (https://www.cancer.org/cancer/cancer-causes/benzene.html) such as leukemia, making
absorption through the skin particularly concerning as there have been multiple studies by FDA
researchers showing that **chemicals in sunscreen products**
**(https://jamanetwork.com/journals/jama/fullarticle/2733085)** are found in the blood at high levels
after application to the skin.

"Benzene is one of the most studied and concerning human carcinogens known to science. Its
association with forming blood cancers in humans has been shown in numerous studies at trace
levels of parts per million and below. The presence of this known human carcinogen in products
widely recommended for the prevention of skin cancer and that are regularly used by adults and
children is very troubling," said David Light, Founder and CEO of Valisure.

The FDA has clearly determined that benzene should not be used in standard pharmaceutical
production at all because of its unacceptable toxicity; however, there currently does not exist any
established *exposure* limit for benzene. The 2ppm *concentration* limit only applies in special
circumstances, which do not include sunscreen manufacturing. Therefore, in addition to recalls,
Valisure is also petitioning the FDA to create a concentration limit for standard drug products,
including sunscreen, and to also set a daily exposure limit.

Public concern regarding contamination of major drug products has significantly increased following
a string of medication recalls over the past three years. Most of these recalls of drugs like valsartan,
ranitidine, and metformin have been due to the "nitrosamine" class of carcinogens, specifically N-
Nitrosodimethylamine (NDMA), which is a Group 2 "probable human carcinogen." Although NDMA
has not been directly linked to cancer in humans, it has both a concentration limit, which ranges
between 0.3 – 3.0 ppm for -sartan medications, and a total daily intake limit of 96 nanograms (ng),
which is kept constant for all drug products

Table of limits set for NDMA and benzene in drug products:

|  | NDMA – Standard Drugs | Benzene – Special Circumstances** | Benzene – Standard Drugs |
|---|---|---|---|
| **Concentration limit** (parts per million) | 0.3 – 3.0 ppm* | 2.0 ppm | Not specified*** |
| **Daily limit** (nanograms) | 96 ng | Not specified | Not specified*** |

\* Dependent on the drug product. These numbers refer to guidance specifically for -sartan medications.

\*\* A drug product constituting a "significant therapeutic advance" where the use of benzene for manufacturing is "unavoidable," or FDA emergency guidance for hand sanitizer during the COVID-19 pandemic.

\*\*\* FDA states that benzene should not be employed in the manufacture of drug substances because of its unacceptable toxicity but does not specifically define limits.

Under "special circumstances," where benzene is unavoidable for the manufacture of a drug with a "significant therapeutic advance," the 2 ppm limit is similar to that of NDMA. If a similar daily exposure limit is set for benzene of 96 ng, then using the most contaminated sunscreen product Valisure identified of 6.26 ppm equates to approximately 695,800 ng of benzene or 7,248 times the NDMA limit.

"There is not a safe level of benzene that can exist in sunscreen products," stated Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University. "Even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene."

Further support for this concern is seen in a 2019 study on sunscreen ingredients where **FDA researchers stated** (https://jamanetwork.com/journals/jama/fullarticle/2733085), "Understanding the extent of systemic exposure of [sunscreen] products is important, as even a low percentage of systemic absorption could represent a significant systemic exposure." This study also found that significant amounts of the ingredients in sunscreens are absorbed through the skin and were detected in the blood at high levels.  Additionally, a study by Health Canada's Bureau of Chemical Hazards has shown that the application of sunscreen specifically **increases the absorption rate of benzene** (https://pubmed.ncbi.nlm.nih.gov/9233379/) through the skin. Absorption through skin and into the blood is particularly concerning regarding benzene, which is associated specifically with blood cancers.

Decades of research has shown that regular exposure to benzene at concentrations of 1 ppm, or potentially even lower, have been clearly associated with the **development of cancers (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5946455/#CR5)** of blood tissues, such as leukemia. This research has largely focused on exposure through inhalation, though absorption of benzene **through skin (https://pubmed.ncbi.nlm.nih.gov/21288163/)** has also been well established. The National Institute for Occupational Safety and Health (NIOSH) **recommends protective equipment (https://www.atsdr.cdc.gov/phs/phs.asp?id=37&tid=14)** be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "skin absorption" as an exposure route.

Case 2:21-cv-01208-JHE  Document 1-3  Filed 09/03/21  Page 6 of 12

Valisure's March 24, 2021 Citizen Petition on **benzene contamination in hand sanitizer (https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-hand-sanitizers/)**, and the recent **recalls of contaminated hand sanitizer products (https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/scentsational-soaps-candles-inc-issues-voluntary-nationwide-recall-scented-hand-sanitizers-due)** due to the presence of benzene, further underscores the necessity to better regulate benzene and its apparent prevalence in the drug and consumer product supply chains.

Beyond the significant concern for public health, there is also evidence that both sunscreen products and benzene pose a serious risk to the environment, marine ecosystems, and United States waterways. The National Oceanic and Atmospheric Administration ("NOAA") has published reports and infographics intended to educate consumers regarding the potential for sunscreen products to **threaten corals and other marine life (https://oceanservice.noaa.gov/news/sunscreen-corals.html)**. Additionally, scientific papers published by NOAA have shown **that benzene can be absorbed by fish (https://spo.nmfs.noaa.gov/sites/default/files/pdf-content/1976/743/korn.pdf)** and short-term exposure (48 hours) to concentrations of benzene at parts per billion levels can significantly **reduce survival of certain fish eggs (https://spo.nmfs.noaa.gov/sites/default/files/pdf-content/1977/751/struhsaker.pdf)**. Furthermore, NOAA has proposed that the use of sunscreen followed by swimming or showering may cause sunscreen chemicals to wash off and enter waterways, an area of significant concern to the Environmental Protection Agency ("EPA") which extensively regulates benzene. Strict EPA regulations on benzene are detailed in a report authored by the **Agency for Toxic Substances and Disease Registry (https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf)** ("ATSDR")  which stated that, "EPA has set 5 ppb [equivalent to 0.005 ppm] as the maximum permissible level of benzene in drinking water. EPA has set a goal of 0 ppb for benzene in drinking water and in water such as rivers and lakes because benzene can cause leukemia."

### Valisure's Findings

Valisure analyzed 294 unique batches from 69 different companies. Significant variability from batch to batch was observed, even within a single company. Fourteen lots of sunscreen and after-sun care products from four different brands contained between 2.78 – 6.26 ppm of benzene; 26 lots from eight brands contained detectable benzene between 0.11 – 1.99 ppm; and 38 lots from 17 brands contained detectable benzene at < 0.1 ppm. Benzene was not detected in an additional 217 batches of sunscreen from 66 different brands through initial analysis of at least one sample. Benzene contamination was detected in sprays, gels, and lotions with both chemical and mineral-based formulations.

Benzene is a colorless or light-yellow liquid chemical at room temperature. It has been used primarily as a solvent in the chemical and pharmaceutical industries and is well known to cause cancer in humans. Trace levels of benzene may be found in cigarette smoke, gasoline, glues, adhesives, cleaning products, and paint strippers.

"Valisure's research identifying benzene contamination in multiple over-the-counter sunscreen products is an extremely important discovery for several reasons. First, it warns people practicing sun protection and skin care that some, but not all, sunscreens have potentially hazardous benzene contamination. Second, it is important for people, especially heading into the summer months, to understand that many sunscreen products tested by Valisure did not have benzene contamination, and those products are presumably safe and should continue to be used, along with appropriate hats and sun-protective clothing, to mitigate skin cancer risk," according to Dr. Bunick. "I believe it is critical that regulatory agencies address benzene contamination in sunscreens, and all topical medications at the manufacturing and final product level, so that all individuals feel safe using sunscreen products."

Valisure's independent chemical testing has identified several serious drug quality issues, which have resulted in global recalls of **ranitidine (https://www.valisure.com/blog/valisure-news/detection-of-ndma-in-raniditine/)**, a once common antacid medication, **metformin (https://www.valisure.com/blog/valisure-news/valisure-detects-high-levels-of-ndma-in-metformin/)**, a top diabetes drug with roughly 90 million prescriptions written per year in the United States, and **hand sanitizer products (https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-hand-sanitizers/)**, marking the first broadly FDA announced drug product recalls for benzene.

"These findings of benzene in sunscreens and after-sun care products build upon our substantiated findings of benzene in hand sanitizers that have already led to national recalls," stated David Light. "It is unfortunately apparent that benzene contamination is a broad and very concerning issue in the American consumer product supply chain and underscores the critical need for independent testing. It is imperative for FDA to expeditiously address current regulatory gaps regarding benzene in both drug and cosmetic products, and we urge FDA and manufacturers to quickly investigate and remove contaminated products from the market."

**Complete Valisure FDA Citizen Petition Documents:**

**Full Citizen Petition** (https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf) – Contains lists of products where benzene was detected.

**Attachment A** (https://www.valisure.com/wp-content/uploads/Attachment-A-Table-5-of-Valisure-FDA-Citizen-Petition-on-Sunscreen-v2.pdf) — Contains list of products where benzene was not detected.

**Attachment B** (https://www.valisure.com/wp-content/uploads/Attachment-B-ACC-Resolution-Chemical-Variability-in-Pharmaceutical-Products.pdf) — Resolution from the American College of Cardiology regarding independent testing.

**Please read** (https://www.valisure.com/blog/valisure-news/responsible-disposal-of-contaminated-sunscreen-products/) **about Responsible Disposal of Potentially Contaminated Products.**

*[a]Sunscreen products are often available in dozens of formulations from numerous companies, and it is estimated by FDA that over 11,000 sunscreen products are on market in the United States. To further assess the pervasiveness of the presence of benzene in sunscreen and after-sun care products on the U.S. market, Valisure is conducting a crowdsourcing study by inviting participants to send in their sunscreen and after-sun care products for testing. For more information and to participate in this study, please click **here (https://www.valisure.com/?page_id=4275&preview=true)**.*

*[b]The views and opinions contained at ConsumerLab.com and its related reports on sun care products are that of ConsumerLab.com, LLC and do not reflect the opinions and beliefs of Valisure, LLC, its members, or Dr. Christopher Bunick.*

**About Valisure**: Valisure's core mission is to independently check the chemical composition of medications and healthcare products before they reach consumers and deliver that transparency throughout the supply chain as a differentiating partner for quality. In response to rising concerns about counterfeits, generics, and overseas manufacturing, Valisure's team of Harvard- and Yale-trained scientists developed proprietary analytical technologies to screen products, identify critical issues, and offer certification to help distinguish quality stakeholders and products. Valisure has ISO 17025 accreditation and is DEA and FDA registered.

SHARE THIS ARTICLE

er/sharer.php?
og/valisure-
in-sunscreen/)

(https://twitter.com/share?text=Valisure Detects
Benzene in
Sunscreen&url=https://www.valisure.com/blog/valisure-
news/valisure-detects-benzene-in-sunscreen/)



(mailto:?subj
Sunscreen&body=h
news/valisure

# See what is being said about Valisure today

VALISURE NEWS

## Valisure Detects Benzene in Sunscreen: Press Coverage



### Read the Article

(https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen-press-coverage/)

VALISURE NEWS

## Responsible Disposal of Contaminated Sunscreen Products



**Read the Article**

(https://www.valisure.com/blog/valisure-news/responsible-disposal-of-contaminated-sunscreen-products/)

VALISURE NEWS

## Valisure and Medly Pharmacy Announce Partnership

    

**Read the Article**

(https://www.valisure.com/blog/valisure-news/valisure-and-medly-pharmacy-announce-partnership/)


View all Articles (https://www.valisure.com/blog/)


# Valisure Certified Medications available through a new pharmacy partnership.

### LEARN MORE (HTTPS://WWW.VALISURE.COM/BLOG/VALISURE-NEWS/VALISURE-AND-MEDLY-PHARMACY-ANNOUNCE-PARTNERSHIP/)


Our pharmacy partner is committed to continuing to provide Valisure Certified medications and exceptional customer service. Any questions please call:

ⓒ 833-497-7370


**Valisure**

203.859.5964 (tel:2038595964)

contact@valisure.com (mailto:contact@valisure.com)

𝐟 (https://www.facebook.com/valisureRx/ )  𝕐 (https://twitter.com/valisure )
𝐢𝐧 (https://www.linkedin.com/company/valisure/ )

**Company**

Careers (https://www.valisure.com/careers/)

Valisure News (https://www.valisure.com/blog/valisure-news/)

Press Releases (https://www.valisure.com/press-releases/)

Media Kit (https://www.valisure.com/?page_id=2240)

Contact Us (https://www.valisure.com/for-industry/#contact-us-form)

**More Info**

Blog (https://www.valisure.com/blog/)

Report A Medication (https://www.valisure.com/report-medication-concern/)

Facebook (https://www.facebook.com/valisureRx)

LinkedIn (https://www.linkedin.com/company/valisure)

Twitter (https://twitter.com/valisure)

**Legal**

Terms of Use (https://www.valisure.com/terms-of-use/)

Privacy Policy (https://www.valisure.com/privacy-policy/)

HIPAA Policy (https://www.valisure.com/?page_id=25)

Internet Pharmacy Site Disclosure (https://www.valisure.com/?page_id=330)

COA Disclaimer (https://www.valisure.com/valisure-coa-disclaimer/)

Copyright 2016-2021 Valisure LLC All Rights Reserved.