BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| In Re: Johnson & Johnson Aerosol Sunscreen Marketing, Sales Practices, and Products Liability Litigation | MDL No. 3015 |
|---|---|

**INTERESTED PARTY RESPONSE**

Plaintiff Conrad De Los Santos[1], an interested party, hereby moves in support of transfer and centralization under 28 U.S.C. § 1407.

**I.  Introduction**

Centralization is appropriate for all cases centering on the recall of Johnson & Johnson's aerosol sunscreen products.

Concerns were first raised about the safety and efficacy of sunscreens in 2019, when the FDA proposed a new rule to regulate nonprescription over-the-counter sunscreen drug products and asked manufacturers for safety data on chemical ingredients, including octocrylene. **Exhibit A**. Octocrylene may degrade to benzophenone, a possible carcinogen, according to scientists who have petitioned the FDA to pull sunscreens from the market that contain octocrylene. See

---

[1] *De Los Santos v. Johnson & Johnson, et al.,* No. 2:21-cv-01208-JHE (N.D. Ala.)

C.A. Downs, *Benzophenone Accumulates over Time from the Degradation of Octocrylene in Commercial Sunscreen Products*, 34 CHEM. RES. TOXICOL., 1046-1054 (2021).

In the proposed rule, the FDA describes concerns about the safety of aerosol spray sunscreens. See Department of Health and Human Services, Food and Drug Administration, *Sunscreen Drug Products for Over-the-Counter Human Use*, 84 Fed. Reg. 6204, 6230 (Feb. 26, 2019). The FDA specifically mentioned concerns about inhalational toxicity—*i.e.*, the potential that consumers might unknowingly inhale harmful chemicals present in the aerosol spray. *Id.* at 6231.

About two years later, on May 24, 2021, Valisure LLC, an independent testing lab, petitioned the FDA to recall several aerosol sunscreen products made by Johnson & Johnson. **Exhibit B**. Valisure petitioned for recall because it detected *high* levels of benzene in the products. *Id.* Johnson & Johnson then voluntarily recalled these aerosol sunscreen products on July 14, 2021, citing *low* levels of benzene present in the aerosol spray.

FDA research shows that the body absorbs enough of the chemical ingredients present in sunscreens for there to be significant

concern about safety. See Murali K. Matta, *Effect of Sunscreen Application on Plasma Concentration of Sunscreen Active Ingredients: A Randomized Clinical Trial*. 323 JAMA 256-257 (2020) (FDA-published study concluding that all six of the tested active ingredients administered in four different sunscreen formulations were systemically absorbed and had plasma concentrations that surpassed the FDA threshold for potentially waiving some of the additional safety studies for sunscreens).

But there is no evidence that manufacturers like Johnson & Johnson have provided any of the safety data that the FDA requested in 2019. Instead, independent groups of scientists like Valisure have tested the products, detected the presence of carcinogens, and triggered safety recalls. Still, Johnson & Johnson characterizes the presence of benzene in the recalled aerosol sunscreens as *low* even though the independent scientists characterize it as *high*. No level of benzene, however, is safe for humans.

Pressure on sunscreen manufacturers will likely continue into 2022, when the U.S. National Academies of Sciences, Engineering, and Medicine, which assembles experts to study controversial issues, is expected to deliver a report on the safety of sunscreens. See Anna

Edney, *Popular sunscreens under scrutiny as scientists cite another potential carcinogen*, LOS ANGELES TIMES (Aug 10, 2021). As recently as August 2021, however, a National Academies panel heard a presentation on research linking benzophenones in sunscreens to endometriosis, a painful condition in which tissue that normally grows inside a woman's uterus forms outside the organ. *Id.*

Plaintiff Conrad De Los Santos brings the first lawsuit for personal injury relating to the dangers of the recalled NEUTROGENA® aerosol sunscreens, including the Beach Defense® and Ultra Sheer® product lines. Conrad used multiple recalled NEUTROGENA® products without having first been warned about the presence of benzene. To protect against sun exposure, Conrad has been a user of aerosol sunscreen for about the last ten years, always keeping a can of it in his car. Conrad historically used NEUTROGENA® aerosol sunscreen several times a week and up to once daily. In or around July 2020, Conrad was diagnosed with two autoimmune disorders: lupus and Crohn's disease. Because of the diagnoses, his rheumatologist recommended that he use sunscreen all the time. Conrad then increased his usage of NEUTROGENA® aerosol sunscreen—up to three times daily.

After increasing his usage of Neutrogena® aerosol sunscreen, Conrad, among other things, had abnormal clinical findings, including abnormal labs and bloodwork, requiring a full workup with a specialist in hematology and oncology. He required blood smears and a bone-marrow aspirate. There are findings present in these abnormal labs, bloodwork, and blood smears consistent with benzene exposure. At the time, Conrad also developed cardiac problems, including atrial fibrillation. He is now known to be at substantial increased risk to develop leukemia or malignancies of the blood. Conrad therefore must be medically monitored to promote early diagnosis and early treatment of those serious diseases for which he is now at increased risk. Because of the health consequences caused by his benzene exposure, moreover, Conrad has been forced to make substantial lifestyle changes, including abstinence from alcohol, caffeine, and sugar.

Benzene, a human carcinogen, is known to cause the kinds of health problems that Conrad has experienced, including autoimmune disorders, malignancies of the blood, and cardiac problems. Conrad has unfortunately been experiencing these problems without having first known about his benzene exposure.

## II. These actions involve common questions of fact.

These actions involve common questions of fact warranting transfer and coordination under 28 U.S.C. § 1407. Centralization is necessary because all the actions share allegations concerning the safety of Johnson & Johnson's aerosol sunscreen products, which were widely used by consumers until the recall on July 14, 2021. See *In re Baycol Products Liability Litigation*, 180 F. Supp. 2d 1378 (J.P.M.L. 2001).

We note that "Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Darvocet, Darvon and Propoxyphene Products Liability Litigation*, 2013 WL 1635469, at *1 (J.P.M.L. 2013). That said, the common questions here that predominate include but are not limited to:

(i) whether Johnson & Johnson knew or should have known that the recalled sunscreen products are unsafe because they contain harmful chemicals like benzene;

(ii) whether Johnson & Johnson underreported, misreported, or failed to warn about the presence of benzene or harmful chemicals in the recalled sunscreen products; and

  (iii) whether Johnson & Johnson has misrepresented the material risks and benefits of the recalled sunscreen products.

These common questions predominate over any individual questions of fact, including those about medical causation. While individuals may respond differently when exposed to differing levels of benzene or other harmful chemicals present in these products, the diseases that exposure may cause can be grouped into defined categories. There exists a concern for not only acute or short-term illness but also for an increased risk of long-term sequelae including cancers, which may call for medical monitoring of those exposed.

  Johnson & Johnson is a multinational conglomerate that has sold and helped make popular these sunscreens in the United States for a substantial length of time. Although most of the pending actions are fundamentally warranty cases seeking class certification under FED. R. CIV. P. 23, these actions all share common questions of fact with *De Los Santos*. The common questions of fact on liability in each action, moreover, center on Johnson & Johnson's design, manufacture, warning, testing, and sale of the recalled sunscreen products.

  We expect that many non-class actions alleging personal injury—like *De Los Santos*—will soon be filed. The allegations and

claims for relief in these personal-injury cases, moreover, will involve the same common questions of fact as the warranty class actions in addition to individual questions centering on medical causation. In ordering centralization of product liability cases, the Panel has stated that "almost all injury litigation involves questions of causation that are case-and plaintiff-specific. Such differences have not been an impediment to centralization in the past." See *In re Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation*, 844 F. Supp. 2d 1371, 1372 (J.P.M.L. 2012).

Though the cases will present some individual questions of fact centering on medical causation, this is common in product liability cases, and the paramount issues concerning design, manufacture, testing, and marketing predominate and are common. See *In re Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Products Liability Litigation*, 53 F. Supp. 3d 1379, 1380-1381 (J.P.M.L. 2014). Furthermore, these cases only involve one defendant as opposed to multiple competing companies and products. Cf. *In re Power Morcellator Products Liability Litigation*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015) (concluding that centralization was not warranted given the multiple, competing defendant companies that marketed,

manufactured, and sold allegedly defective products). Centralization under Section 1407 is therefore appropriate.

**III. Centralization will serve the convenience of the parties, prevent duplicative discovery, and promote the just and efficient resolution of all cases.**

Centralization here will serve the convenience of the parties, minimizing the otherwise duplicative effort. See *In re "Factor VIII or IX Concentrate Blood Prods." Prod. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993). See also *In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis with Kinectiv Technology and VerSys Femoral Head Products Liability Litigation*, 340 F. Supp. 3d 1379, 1380-81 (J.P.M.L. 2018) (concluding that pretrial consolidation of proceedings in 21 product liability actions pending in multiple districts was warranted because centralization would eliminate duplicative discovery, avoid the possibility of conflicting rulings on pretrial motions, and conserve resources of parties, their lawyers, and the judiciary). Centralization will also minimize the risk of inconsistent rulings on the common questions of fact from various courts across the country.

Individual litigation would carry with it substantial duplicative discovery and would promote conflicting rulings on pretrial motions.

9

Individual litigation would also promote waste of precious judicial resources given that the actions share one common defendant and common questions of fact on liability. See *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, 543 F. Supp. 2d 1376, 1377 (J.P.M.L. 2008) (concluding that centralization was appropriate in part because the actions involved common questions of fact and transfer would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.").

IV. **The Northern District of Alabama (PROCTOR, J.) is the most appropriate transferee forum.**

Section 1407 does not prescribe specific factors by which the Panel is to designate the transferee district or judge. Nonetheless, the Panel's choice of transferee court and judge should be made in consideration of the underlying statutory goal of Section 1407(a): "the convenience of parties and witnesses [to] promote the just and efficient conduct of such actions."

Although the location of evidence and pending litigation are important to consider, the Panel regularly employs other common-sense considerations. For example, on many occasions, the Panel has chosen a transferee forum that is centrally located geographically in terms of where the parties and cases are situated. See *In re*

*Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices and Products Liability Litigation*, 466 F. Supp. 3d 1380, 1382 (J.P.M.L. 2020) ("We conclude that the Western District of Missouri is an appropriate transferee forum. It is centrally located and easily accessible, making it a convenient forum for this nationwide litigation.").

The Northern District of Alabama is centrally located geographically to the nationwide docket. The Northern District of Alabama is also well equipped to manage MDLs, having many resources at its disposal, including both magistrate judges and a competent clerk's office.

Birmingham is an accessible metropolitan area well served by major airlines with hotel and office accommodations. Birmingham-Shuttlesworth International Airport (BHM), moreover, is centrally located with easy access to I-20 and a short drive to Downtown Birmingham. BHM is home to four major airlines servicing 100 daily flights to 15 cities for more than 3 million passengers each year, including direct nonstop flights to New York (LGA), Washington D.C. (DCA), Philadelphia, Chicago, Houston, Las Vegas, Tampa, Denver, Miami, Charlotte, Orlando, Detroit, and Atlanta.

The Honorable R. DAVID PROCTOR is an experienced transferee judge who has demonstrated an ability to handle complex MDLs in a just and efficient manner. JUDGE PROCTOR, moreover, served as a member of the Judicial Panel on Multidistrict Litigation from April 11, 2014, to October 15, 2020.

Since exiting the Panel, though, JUDGE PROCTOR has not enjoyed the opportunity to take on a new MDL. The sole MDL pending on his docket (No. 2406, *In re: Blue Cross Blue Shield Antitrust Litigation*), is reaching its endpoint with little judicial action required and only 19 actions still pending. Coordination and transfer to JUDGE PROCTOR would therefore help "permit [...] the Panel to effect the Section 1407 assignment to a judge who has extensive experience in multidistrict litigation" and the recognized ability to lead this litigation "on a steady and expeditious course." See *In re: Chinese-Manufactured Drywall Products Liab. Litig.*, 626 F. Supp. 2d 1346, 1347 (J.P.M.L. 2009).

The other proposed transferee forums are not more appropriate than the Northern District of Alabama, which only has one MDL on its docket. The District of New Jersey is heavily burdened with large pending MDLs requiring substantial judicial involvement, including:

- *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation* (WOLFSON, J.) (No. 2783) (34,866 actions pending);

- *In re: Proton-Pump Inhibitor Products Liability Litigation (No. II)* (CECCHI, J.) (No. 2789) (13,416 actions pending);

- *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation* (KUGLER, J.) (No. 2785) (909 actions pending);

- *In re: Allergan Biocell Textured Breast Implant Products Liability Litigation* (MARTINOTTI, J.) (No. 2921) (878 actions pending);

- *In re: Elmiron (Pentosan Polysulfate Sodium) Products Liability Litigation* (MARTINOTTI, J.) (No. 2973) (497 actions pending); and

- *In re: Fosamax (Alendronate Sodium) Products Liability Litigation (No. II)* (WOLFSON, J.) (No. 2243) (258 actions pending).

Similarly, although it is a large judicial district with many resources, the Southern District of New York has 17 MDLs burdening its docket. Another proposed transferee forum, the Northern District of California, has 22 MDLs burdening its docket.

Taken together, these *three* judicial districts account for 9 of the 39 (23%) judicial emergencies[2] facing the federal district courts. In contrast, The Northern District of Alabama is centrally located geographically to the nationwide docket; has ample judicial resources;

---

[2] See Judicial Conference of the United States, https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies (last updated Sept. 8, 2021).

does not have any judicial emergencies; and is not overburdened with MDLs.

For these reasons, the Northern District of Alabama is the most appropriate transferee forum under the circumstances. JUDGE PROCTOR, moreover, should be the transferee judge for these cases.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## V. Conclusion

We respectfully request that the Panel grant the motion for transfer and coordination under Section 1407. We further request that the Panel transfer the actions to the Northern District of Alabama before the Honorable R. DAVID PROCTOR.

Submitted: September 8, 2021

*[signature]*

François M. Blaudeau (ASB-7722-D32F)
Evan T. Rosemore (ASB-3760-N10B)
SOUTHERN MED LAW
2224 1st Ave North
Birmingham, AL 35203
D: 205.547.5525
F: 205.547.5526
francois@southernmedlaw.com
evan@southernmedlaw.com

*Attorneys for the Plaintiff Conrad De Los Santos*